[No. E049411. Fourth Dist., Div. Two. July 5, 2011.]

MOHAMMAD MANSUR et al., Plaintiffs and Appellants, v.
FORD MOTOR COMPANY et al., Defendants and Respondents.

■■■■■■■■■■■■

## Counsel

Panish Shea & Boyle, Brian J. Panish, Adam K. Shea; Dreyer Babich Buccola Wood, Robert A. Buccola, Steven M. Campora, Jason Sigel; Turner & Associates and C. Tab Turner for Plaintiffs and Appellants.

Snell & Wilmer, Troy Booher and Richard A. Derevan for Defendants and Respondents.

## Opinion

**MILLER, J.**—Plaintiffs and appellants, Mohammad Mansur, individually and as successor in interest for the estate of Omeedeh Mansur, and Arman Mansur and Artemis Mansur, minors (collectively referred to as Plaintiffs), sued Ford Motor Company (Ford) and Drew Ford for (1) strict product liability; (2) negligence; and (3) breach of implied and express warranties. The lawsuit emanated from a fatal car accident. Omeedeh Mansur (Omeedeh) died after the Ford Explorer she was riding in rolled over. A jury returned a verdict in favor of the defense. The trial court awarded Ford and Drew Ford their costs, in the amount of $432,968.03.

Plaintiffs raise three contentions. First, Plaintiffs assert the trial court erred by not instructing the jury on the topic of the "consumer expectations test." (See Judicial Council of Cal., Civ. Jury Instns. (2011) CACI No. 1203.) Second, Plaintiffs contend the trial court erred by removing Juror No. 10. Third, Plaintiffs assert the trial court erred in several evidentiary rulings. We affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

In this part, we provide background facts and facts related to the car accident. Facts related to the specific contentions are presented within the Discussion part, *post*.

Omeedeh was married to Mohammad Mansur (Mohammad). Omeedeh was an attorney. Mohammad is an engineer. Omeedeh and Mohammad bought a

house in Tustin. Omeedeh and Mohammad's first child was a daughter, Artemis. In January 2001, approximately 22 months after Artemis was born, Omeedeh and Mohammad had a son, Arman. Mohammad leased then purchased a 1996 Ford Explorer from Drew Ford, in La Mesa.

On a Thursday, in September 2003, Omeedeh, Mohammad, Artemis, and Arman flew from the Ontario airport to the San Francisco Bay Area to visit Mohammad's sister for the weekend. The following Sunday, September 14, 2003, the family flew back to the Ontario airport. Mohammad retrieved the Explorer from the parking lot and planned to drive the family back to Tustin. Mohammad drove southbound on Interstate 15. Omeedeh was seated in the passenger seat; Arman was seated in the rear seat, in a child restraint, on the passenger side; and Artemis was seated in the rear seat, in a booster chair restraint, on the driver's side. All four family members were wearing their seatbelts. The weather was sunny and clear, and traffic was light.

As Mohammad traveled on the interstate, at approximately 50 to 60 miles per hour, he noticed a cloud of dust and saw a white car spinning out of control. It appeared to Mohammad that the white car would spin into the path of his Explorer. As the white car crossed into Mohammad's path, he steered to the left; there were three or four traffic lanes to Mohammad's left. Mohammad believed that by veering to the left he would be able to pass the spinning car and continue driving south. However, as Mohammad steered left and lightly applied the brakes, he lost control of the Explorer.

The Explorer moved to the left, towards the center median, and then rolled over. The Explorer did not strike the center median. Ultimately, the Explorer came to a stop on its roof. Mohammad asked the children if they were okay, and they were both crying. Mohammad asked Omeedeh if she was okay, but she just moaned. Mohammad was able to exit the Explorer, as were the two children.[1]

When the paramedics arrived, Omeedeh was unresponsive inside the Explorer. The paramedic found Omeedeh still wearing her seatbelt, in the upside down vehicle. The roof of the Explorer, above Omeedeh's head, was crushed into the passenger seat. Omeedeh's head and neck were "cocked back," and her head was touching the crushed ceiling of the Explorer. In other words, Omeedeh's neck was extended and her head was back, so that her forehead was touching the ceiling of the vehicle. A paramedic noticed a jagged cut on Omeedeh's forehead, and blood "everywhere." Another paramedic cut the seatbelt and assisted in removing Omeedeh from the Explorer.

---

[1] Mohammad suffered a broken clavicle, broken ribs, and a head contusion. Artemis suffered bruising. Arman had a closed-head injury, a broken finger, and bruising.

Omeedeh was removed from the vehicle via the driver's door window. Omeedeh was taken to the hospital.

Omeedeh suffered a scalp laceration, multiple rib fractures, lung contusions, clavicle fractures, and an arm fracture. Omeedeh died approximately two hours after arriving at the emergency room. The cause of Omeedeh's death was blunt force injury, as a result of the rollover incident.

In total, the Explorer rolled over three and one-half times. As the vehicle rolled, the roof above the passenger seat buckled, and crushed in towards Omeedeh approximately 11.75 inches. An engineering consultant, Stephen Syson, explained that effective protection in a rollover accident requires "survival space." "Survival space" is defined as maintaining the integrity, or shape, of the passenger compartment of the vehicle.

Syson explained that multiple pillars form the structure of a vehicle like the Explorer. One of the pillars, known as the "A-Pillar" is located on either side of the vehicle's windshield. The "B-Pillar" runs "between the front door and the rear door." In regard to Plaintiffs' Explorer, Syson saw buckling (1) where the A-Pillar joined the windshield; (2) above the base of the B-Pillar; and (3) at the belt line. Syson noticed that the roof above the passenger seat had moved into the occupant's survival space.

A biomechanical engineer testified that the buckling portion of the vehicle struck Omeedeh, and caused Omeedeh's head to be pushed backwards. Specifically, the biomechanical engineer opined that the direction of the laceration on Omeedeh's scalp matched the direction that the A-Pillar was moving during the rollover. The biomechanical engineer explained that the A-Pillar moved backwards, pushing Omeedeh's head backwards, and then the roof collapsed on top of Omeedeh's head, trapping her head. The biomechanical engineer opined that if Omeedeh's survival space had been maintained, then Omeedeh would have been able to walk away from the accident with mild to moderate injuries, similar to her family members' injuries. The biomechanical engineer concluded that if the 1996 Explorer had a reasonably strong roof and properly functioning seatbelt, then Omeedeh would not have suffered a permanent injury.

Syson explained that the 1996 Explorer "has a relatively high center of gravity compared to its track width," which made it "somewhat more likely to overturn than a passenger car." Syson explained that it is important to build a stronger roof on a vehicle that has a greater chance of rolling over, because the stronger roof will provide greater protection to the vehicle occupants

during the rollover. Syson explained that, in 1993, an engineer recommended that for future models Ford (1) " '[c]hange the A-Pillar inner and inner reinforcement material from cold rolled steel to high strength steel' " and (2) add weld points to extend the reinforcement of the B-Pillar by approximately 11 inches.

Syson stated that between 1993 and the time the 1996 Explorer was produced, Ford increased the weight of the Explorer by approximately 170 pounds. However, Ford did not change to the higher strength A-Pillar material. Ford did extend the reinforcement of the B-Pillar, but not as far as recommended by the engineer in 1993; the reinforcements were extended approximately six and one-half or seven inches. Syson explained that the failure to extend the B-Pillar reinforcement created a hole, or weak point. Syson believed that Ford should have designed the Explorer's roof to support three times the vehicle's weight. Syson believed that Ford could have followed the engineer's two suggestions to improve the Explorer's roof strength, because the suggestions were economically and technologically feasible in 1994, 1995, and 1996.

Syson concluded that the 1996 Explorer's roof structure was not reasonably safe, because Ford could have made the structure stronger, but chose not to.

In regard to the seatbelt system, Syson explained that when a seatbelt is across a person's pelvis, it keeps the person sitting in the seat. When designing a seatbelt system, it is important that the retractor portion of the belt lock during a rollover accident in order to minimize movement. Syson performed tests on the Explorer's seatbelt retractors and found that they were not designed to remain locked during a rollover. Syson explained that if a retractor unlocks during a rollover, then the seatbelt will loosen, and the occupant's buttocks will lift off of the seat.

Syson stated that the seatbelt system used in the 1996 Explorer was a "pass through latch plate," which allows the tension on the shoulder belt and lapbelt to equalize so that the belt can slide from the top to the bottom or vice versa. Syson concluded that the safety belt system on the 1996 Explorer was defective, because the retractor system did not remain locked during rollover accidents.

When discussing alternative seatbelt designs, Syson testified that a pretensioner device in the seatbelt could lock the retractor during a rollover accident. Syson explained that a dual pretensioner—tightening the lap and shoulder belts—would reduce the amount of occupant movement during a rollover. Syson stated that 90 percent of Ford vehicles sold in Europe in 1995 included a pretensioning device.

Another alternative safety design for a seatbelt system is an integrated seat, in which the seatbelt comes out of the seatback and the lapbelt anchor is attached to the seat, so that the entire restraint system is fastened into the seat. The benefit of the integrated seat design is that if the B-Pillar is deformed in an accident, then the seatbelt can remain tight.

## DISCUSSION

### A. *Jury Instruction*

#### 1. *Procedural History*

On April 23, 2009, Ford filed a motion in limine seeking to "preclude the use of the consumers expectations test of design defect" (CACI No. 1203),[2] thereby limiting Plaintiffs to the risk-benefit test for proving a design defect. Ford argued that Plaintiffs should not be allowed to rely on the consumer expectations test because a vehicle's stability, handling, roof strength, and restraint characteristics are beyond the common experience of an ordinary consumer. Ford asserted that the consumer expectations test was reserved for cases where expert opinion was not necessary to establish or refute the alleged design defect. Ford argued that proving the defects claimed by Plaintiffs would require experts to testify about substantial technical and mechanical details, and that Ford would defend itself via expert testimony. Ford asserted that an ordinary consumer "has no legitimate expectation as to how a complex product such as the 1996 Explorer should perform under all foreseeable circumstances or how safe it could be made against all foreseeable hazards, including rollover accidents."

Plaintiffs opposed Ford's motion. Plaintiffs asserted that Ford's motion should not be granted because (1) Ford did not provide evidence to support its arguments; (2) Ford was improperly trying to limit Plaintiffs presentation of the case; (3) Ford did not cite any legal authority for allowing the evidence to be excluded prior to the evidence being introduced; (4) none of the cases cited by Ford supported precluding use of the consumer expectation test in Plaintiffs' case; and (5) Ford had no basis for excluding expectation evidence prior to the evidence being offered.

---

[2] CACI No. 1203 provides: "[Name of plaintiff] claims the [product]'s design was defective because the [product] did not perform as safely as an ordinary consumer would have expected it to perform. To establish this claim, [name of plaintiff] must prove all of the following: [¶] 1. That [name of defendant] [manufactured/distributed/ sold] the [product]; [¶] 2. That the [product] did not perform as safely as an ordinary consumer would have expected at the time of use; [¶] 3. That [name of plaintiff] was harmed while using the [product] in a reasonably foreseeable way; and [¶] 4. That the [product]'s failure to perform safely was a substantial factor in causing [name of plaintiff]'s harm."

Ford filed a reply to Plaintiffs' opposition. In the reply, Ford asserted, "Nowhere in [Plaintiffs'] opposition do they dispute the complex nature of the subject accident in relation to their alleged design defect claims." Ford argued that Plaintiffs' defect theories would involve substantial technical and mechanical detail, and that Plaintiffs had retained numerous experts to explain how the accident occurred, and how Omeedeh sustained her injuries. Ford contended that, given the circumstances, it would be error to allow Plaintiffs to proceed under the consumer expectations test.

On July 15, 2009, the 38th day of trial, the trial court heard argument on the motion in limine. The trial court said that it reviewed various cases, and that it believed the issue "is closer than either side put forward in [the] motion and opposition." The court explained that it was granting Ford's motion based in part upon *Pruitt v. General Motors Corp.* (1999) 72 Cal.App.4th 1480 [86 Cal.Rptr.2d 4], in which the appellate court held that the consumer expectations test was reserved for cases in which the everyday experience of users would permit a finding that the product's design was defective.

The trial court reasoned that the instant case was "complicated because we are not simply talking about whether a . . . single item or safety feature of the vehicle did or did not deploy or perform as it was supposed to. This case involves a number of areas of expert opinion testimony dealing with roof crush design, the safety restraint systems in place, [and] forces at various locations on the vehicle at various times during the roll of the vehicle . . . ." The trial court concluded, "This case has involved extremely complicated, difficult and lengthy cross-examination in areas frankly that there is no question in my mind the ordinary consumer would know nothing about."

2. *Analysis*

(a) *Contention*

Plaintiffs contend the trial court erred by not instructing the jury on the consumer expectations test. (CACI No. 1203.) We disagree.

(b) *Standard of Review*

We apply the de novo standard of review to Plaintiffs' contention that the trial court erred by refusing to instruct the jury on the consumer expectations test. (*Ford v. Polaris Industries, Inc.* (2006) 139 Cal.App.4th 755, 766 [43 Cal.Rptr.3d 215].)

### (c) *Design Defect*

■ "Products liability may be premised upon a theory of design defect, manufacturing defect, or failure to warn. [Citation.] Defective design may be established under two theories: (1) the consumer expectations test, which asks whether the product performed as safely as an ordinary consumer would expect when used in an intended and reasonably foreseeable manner; or (2) the risk/benefit test, which asks whether the benefits of the challenged design outweigh the risk of danger inherent in the design. [Citations.] Both theories may be presented to [a] jury. [Citation.]" (*Saller v. Crown Cork & Seal Co., Inc.* (2010) 187 Cal.App.4th 1220, 1231–1232 [115 Cal.Rptr.3d 151] (*Saller*).)

"The consumer expectations test is reserved for cases in which the everyday experience of the products' users permits a conclusion that the product's design violated minimum safety assumptions, and is 'defective regardless of expert opinion about the merits of the design.' [Citation.] Therefore, if the minimum safety of a product is within the common knowledge of lay jurors, expert witnesses may not be used to demonstrate what an ordinary consumer should expect. Nonetheless, the inherent complexity of the product itself is not controlling on the issue of whether the consumer expectations test applies; a complex product 'may perform so unsafely that the defect is apparent to the common reason, experience, and understanding of its ordinary consumers.' [Citation.]" (*Saller, supra,* 187 Cal.App.4th at p. 1232, italics omitted.)

### (d) *Jury Instruction*

■ The general rule regarding jury instructions is that "a party is entitled to have the jury instructed as to his theory of the case provided (1) that he requests and submits legally correct instructions, and (2) that there is sufficient evidence to support the theory [citation]." (*Bains v. Western Pacific R.R. Co.* (1976) 56 Cal.App.3d 902, 905 [128 Cal.Rptr. 778].) When discussing instructions related to the consumer expectations theory, our Supreme Court focused on the second prong of the jury instruction rule, and wrote that instructions related to consumer expectations "are not appropriate where, as a matter of law, the evidence would not support a jury verdict on that theory." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 568 [34 Cal.Rptr.2d 607, 882 P.2d 298] (*Soule*); see also *Campbell v. General Motors* (1982) 32 Cal.3d 112, 126 [184 Cal.Rptr. 891, 649 P.2d 224] ["plaintiff presented sufficient evidence to have the case submitted to the jury on [the consumer expectations] theory . . ."].)

### (e) *Evidence Required*

■ "In *Campbell v. General Motors Corp.*[, *supra*,] 32 Cal.3d 112, 127 . . . , the court noted that the quantum of proof necessary to establish a design defect under the consumer expectations test could not be reduced to an 'easy formula.' 'However, if the product is one within the common experience of ordinary consumers, it is generally sufficient if the plaintiff provides evidence concerning (1) his or her use of the product; (2) the circumstances surrounding the injury; and (3) the objective features of the product which are relevant to an evaluation of its safety.' [Citation.] The test is that of a hypothetical reasonable consumer, not the expectation of the particular plaintiff in the case. [Citation.]" (*Saller, supra*, 187 Cal.App.4th at p. 1232.)

"[E]xpert witnesses may not be used to demonstrate what an ordinary consumer would or should expect," because the idea behind the consumer expectations test is that the lay jurors have common knowledge about the product's basic safety. (*Soule, supra*, 8 Cal.4th at p. 567.) Using expert testimony to demonstrate common knowledge would be inappropriate (Evid. Code, § 801, subd. (a)), "and would invite circumvention of the rule that the risks and benefits of a challenged design must be carefully balanced whenever the issue of design defect goes beyond the common experience of the product's users." (*Soule*, at p. 567.)

### (f) *Evidence Presented*

#### (1) *Use of the Product*

We begin with the first evidentiary requirement: use of the product. Mohammad stated that he and Omeedeh bought the Explorer with the intent of using it as a family car. Mohammad testified that at the time of the accident he was driving approximately 50 to 60 miles per hour, on Interstate 15. Omeedeh was seated in the passenger seat; Arman was seated in the rear seat, in a child restraint, on the passenger side; and Artemis was seated in the rear seat, in a booster chair restraint, on the driver's side. All four family members were wearing their seatbelts. The weather was sunny and clear, and traffic was light.

The foregoing evidence describes Omeedeh's general use of the product, as well as her use of the Explorer on the day of the injury. The evidence provides sufficient detail about Omeedeh's use of the car as a passenger, in particular, the weather and traffic conditions, as well as Omeedeh's use of a seatbelt. Accordingly, we conclude Plaintiffs presented sufficient evidence as to the use of the product.

### (2) *Circumstances Surrounding the Injury*

Next, we consider the second evidentiary requirement: the circumstances surrounding the injury. As the white car crossed into Mohammad's path, he steered to the left; there were three or four traffic lanes to Mohammad's left. However, as Mohammad steered left and lightly applied the brakes, he lost control of the Explorer. The Explorer moved to the left, towards the center median, and then rolled over. The Explorer did not strike the center median. Ultimately, the Explorer came to a stop on its roof.

A paramedic testified that when he arrived at the scene of the accident, Omeedeh was breathing, but unresponsive, inside the Explorer. The paramedic found Omeedeh still wearing her seatbelt, in the upside-down vehicle. The paramedic noticed that the roof of the Explorer, above Omeedeh's head, had compressed into the vehicle. Another motorist, who witnessed the accident, testified that "[t]he roof had compressed down on the seat and [Omeedeh] was between the roof and the top of the front seat."[3] The paramedic saw that Omeedeh's head and neck were "cocked back," and her head was touching the crushed ceiling of the Explorer. In other words, Omeedeh's neck was extended and her head was back, so that her forehead was touching the ceiling of the vehicle. The paramedic noticed a jagged cut on Omeedeh's forehead, and blood "everywhere." Another paramedic cut the seatbelt and assisted in removing Omeedeh from the Explorer. Omeedeh was removed from the vehicle via the driver's door window. Omeedeh was taken to the hospital.

The trauma surgeon, who was on call the day of Omeedeh's accident, testified that Omeedeh suffered a scalp laceration, multiple rib fractures, lung contusions, clavicle fractures, and an arm fracture. Omeedeh died approximately two hours after arriving at the emergency room. The cause of Omeedeh's death was blunt force injury as a result of the rollover incident.

The foregoing evidence describes the circumstances surrounding the injury. Plaintiffs provided quite a bit of detail about the accident from eyewitnesses, as opposed to experts. The evidence is sufficient to permit a jury to understand that the Explorer rolled over and came to a rest on its roof, as well as the fact that the roof crushed in over Omeedeh's head. A jury could also glean from the evidence that the roof was the source of the laceration on Omeedeh's scalp. Accordingly, we conclude Plaintiffs provided sufficient evidence regarding the circumstances of the injury.

---

[3] Syson, who testified about the Explorer's safety belts and roof, provided measurements about the roof crush; however, since we are examining the evidence for purposes of the consumer expectations test, we do not consider the testimony provided by experts. (*Soule, supra*, 8 Cal.4th at p. 567.)

### (3) *Objective Features*

We now turn to the third evidentiary requirement: the objective features of the product, which are relevant to an evaluation of its safety.

Plaintiffs presented marketing evidence related to the Explorer. Specifically, Plaintiffs provided the testimony of John Siegel, a Ford marketing employee. Siegel was involved in marketing research for the Explorer from approximately 1993 to 1994. Siegel testified about the results of a focus group conducted in late 1993. The Explorer was among the vehicles displayed to the focus group. The results of the focus group revealed that people viewed sport utility vehicles as "the station wagon of the 90s," as well as perceiving Explorers to provide a greater sense of safety and security, due to the ride height, greater visibility, mass of the vehicle, and sense of control.

While testifying on direct examination, Mohammad stated when he leased the Explorer from the Drew Ford dealership, he was not given any information about how the vehicle performed when it was being developed, nor was he given information about how the roof performed in tests conducted by Ford. Mohammad stated he read the Explorer's owner's manual when he took possession of the car, and the Explorer worked "great." Mohammad testified there were Goodyear tires on the Explorer at the time the rollover occurred.

While testifying on cross-examination, Mohammad stated he noticed the Explorer handled differently than a passenger car, and he had seen a warning on the driver's sun visor that SUV's handle differently than passenger cars. Mohammad testified when he read the owner's manual for the Explorer, he saw a warning the Explorer was not designed "for cornering at speeds as high as passenger cars." Mohammad stated that during over approximately 100,000 miles of driving the Explorer, he did not experience any loss of control of the vehicle or experience trouble changing lanes.

On redirect examination, Mohammad testified the warning on the sun visor did not explain the Explorer was likely to "tip-up." Mohammad stated he did not read anything in the owner's manual about how the safety belts operated in a rollover accident. Mohammad stated he did not expect the Explorer to roll over when he moved to avoid the spinning car.

■ The foregoing evidence provides proof that the Explorer may have been viewed as a family vehicle, that the Explorer worked "great," and that it had Goodyear tires on it. The evidence also reflects there was a warning on the vehicle's sun visor about the handling of SUV's. The evidence does not

show the vehicle's objective features in such a way that a jury could understand why the roof crushed in on Omeedeh. The fact the Explorer may be a family vehicle does not mean it will never suffer damage in an accident, or that it will never roll over. In other words, proof the Explorer is a family vehicle is not sufficient to evaluate the vehicle's safety. Further, evidence the vehicle handles differently than a passenger car does not equate with evidence the roof and restraint system are designed to handle a rollover. Since Plaintiffs did not present sufficient evidence about the objective features of the product, which are relevant to an evaluation of its safety, we conclude the trial court correctly denied the consumer expectations instruction.[4]

Plaintiffs assert, "[b]ecause Ford marketed the Explorer as a station wagon replacement, no consumer would expect an Explorer to rollover in response to a normal avoidance maneuver." The problem with Plaintiffs' argument is that evidence of a "family vehicle" marketing strategy does not equate with evidence of " 'the objective features of the product[,] which are relevant to an evaluation of its safety.' " (*Saller, supra*, 187 Cal.App.4th at p. 1232.) As a hypothetical, if Ford disseminated advertisements showing the Explorer rolling over, and four occupants walking away from the vehicle unharmed, then that advertising evidence might be helpful in establishing the vehicle's objective features. However, evidence the Explorer is a "family vehicle" is too vague to provide any meaningful insight into the vehicle's features. Since Plaintiffs are primarily relying on evidence related to the Explorer being marketed as a family vehicle, we conclude their argument is unpersuasive.

Next, Plaintiffs rely on *McCabe v. American Honda Motor Co.* (2002) 100 Cal.App.4th 1111 [123 Cal.Rptr.2d 303] (*McCabe*) to support their contention. In *McCabe*, the plaintiff "was injured when the driver's side air bag in her Honda Civic failed to deploy in a frontal collision with another car." (*Id.* at p. 1116.) The plaintiff sued Honda and the airbag manufacturer, as well as other parties. The trial court granted Honda's motion for summary judgment, because an expert's declaration, provided by Honda, proved the airbag was not designed to inflate under the circumstances of the crash. The trial court concluded the plaintiff's testimony "that she 'expected' the air bag to deploy was insufficient, without expert testimony, to raise a triable issue of material fact as to product defect." (*Ibid.*)

The appellate court reversed the judgment. (*McCabe, supra,* 100 Cal.App.4th at p. 1127.) The appellate court noted that Honda reconstructed the accident and "maintain[ed] the accident occurred at a speed and at a

---

[4] We note Plaintiffs provided expert testimony about the roof and restraint systems, but again, since this is the consumer expectations theory of liability, we do not include the expert testimony in our analysis. (*Soule, supra,* 8 Cal.4th at p. 567.)

collision range outside that required for the air bag to deploy." (*Id.* at p. 1124.) However, the plaintiff presented evidence that the accident was a "head on" collision, which would have been "within the 'frontal collision range' depicted in Honda's owner's manual." (*Ibid.,* italics omitted.) Further, the appellate court wrote that the plaintiff provided evidence the car that hit the Honda was traveling at 25 miles per hour when it struck the Honda, which is the speed identified in the owner's manual as minimum speed necessary for the airbag to deploy. (*Ibid.*) The appellate court concluded that the plaintiff "provided sufficient evidence for a jury to infer that the nonde-ployment of an air bag, in the context of the high-speed, 'head-on' collision described by [the plaintiff], violates minimum safety expectations of the ordinary consumer." (*Id.* at p. 1125.)

We find the instant case distinguishable from *McCabe* because the instant record does not present pertinent nonexpert testimony related to the features of the Explorer, which would allow a trier of fact to evaluate the safety of the roof and restraint system. For example, Mohammad testified he read the owner's manual when he leased the Explorer; however, he did not recall reading about how the restraint system would operate during a rollover. By contrast, in *McCabe*, there was nonexpert evidence about the objective features of the airbag, in particular the circumstances under which the airbag should deploy. Without similar evidence in the instant case, we conclude the instant case is distinguishable from *McCabe*.

Finally, Plaintiffs analogize their case to *Buell-Wilson v. Ford Motor Co.* (2006) 141 Cal.App.4th 525 [46 Cal.Rptr.3d 147] (*Buell*). In *Buell*, the plaintiff sued Ford and Drew Ford "as a result of the rollover and roof crush of her Ford Explorer . . . that left her a paraplegic." (*Id.* at p. 531.) A jury found the Explorer was defectively unstable and not crashworthy due to a defect in the roof. The jury awarded the plaintiff damages for her injuries. (*Ibid.*) The appellate court noted: "Ford has not challenged on appeal the sufficiency of the evidence supporting the jury's finding that the Explorer was defective on either of these grounds." (*Id.* at p. 535, fn. omitted.) Rather, on appeal, Ford argued that the trial court (1) erroneously admitted evidence about problems with the Explorer's predecessor vehicle, the Ford Bronco II; (2) the noneconomic portion of the damages award was excessive; (3) punitive damages were improperly awarded; and (4) the punitive damages award was excessive. (*Id.* at p. 532.)

Plaintiffs analogize their case to *Buell* because they assert that in *Buell* the "plaintiff's experts testified that the Explorer was unstable and defective," and therefore *Buell* "illustrates comparable evidence was sufficient to support

liability." Contrary to Plaintiffs' view, *Buell* does not address the legal sufficiency of the evidence. Further, it is well settled that expert testimony is not relevant in a consumer expectations theory of liability. (*Soule, supra,* 8 Cal.4th at p. 567.) Accordingly, we are not persuaded that expert testimony about roof crush is sufficient evidence for purposes of showing the objective features of the product, which are relevant to an evaluation of its safety.

### B. *Juror No. 10*

#### 1. *Facts*

On July 16, 2009, the 39th day of trial, the court attendant informed the trial court that Juror No. 10 approached and told the attendant that he had been reading a newspaper article that morning about a Ford rollover accident, and the juror indicated to the attendant that the article impacted his view of the case. The court decided to question Juror No. 10.

While being questioned by the court, Juror No. 10 confirmed that he told the court attendant he had read an article about a Ford Explorer rollover accident. The juror said he read the article that morning in a local newspaper. The juror explained, "[I]t was just a picture of a car accident and initially [he] wasn't going to look at it and then [he] just read through it and [he] said, oh, why did I read that? Because it was talking about a Ford Explorer rolling over." The juror explained that he was prompted to read the article because of the picture of "a crum[p]led up car."

The court asked Juror No. 10 if the juror told the court attendant that reading the article impacted his view of the case. Juror No. 10 responded, "I don't know. You tell me. You know, I didn't, you know, think about it real deeply, but it just kind of had a minor influence on me."

After Juror No. 10 was excused, the court invited counsel to comment on the issue. Plaintiffs' counsel stated that he viewed the newspaper and that it was not an article about the accident, rather, it was a photograph with a caption that was approximately three lines long. He stated the newspaper identified the vehicle involved as a Ford Explorer, and reflected that it was a rollover accident. Plaintiffs' counsel suggested that the court ask Juror No. 10 if he can set aside the newspaper information and make a decision based upon the evidence.

Ford's counsel argued that Juror No. 10 should be dismissed because (1) Juror No. 10 indicated the article did have an influence on him; (2) he described the

car as "crumpled up," which is "a characterization that reveals the extent to which" he has been influenced; (3) four alternate jurors were available to be seated; and (4) Juror No. 10 ignored the trial court's admonition to the jury to make sure nothing outside the courtroom influences their judgment.

The trial court expressed concern that Juror No. 10 chose to read the caption about the car accident, rather than "simply avert his eyes and read something else in the newspaper." The court also had "great concerns about the ability of [the] juror to continue to be able to perform his duties as a juror; to fairly and impartially discuss the case, the state of the evidence, and to deliberate with his or her colleagues only on the evidence. Particularly in light of the fact that he [said] that reading [the] information . . . did have an impact on him." The trial court noted the amount of impact was not "really subject to quantifying," so it could not be determined exactly how "minor" the impact was. The trial court concluded Juror No. 10 should be dismissed because (1) he failed to follow the court's admonitions and instructions, and (2) the juror stated the newspaper information had an impact on him.

Plaintiffs' counsel requested that the trial court ask Juror No. 10 whether he would be willing to follow the court's admonitions and instructions, and whether he would be able to make a decision based only upon the evidence. The trial court agreed to question Juror No. 10 a second time.

The trial court asked Juror No. 10 if he would be able to be fair and impartial during the trial. Juror No. 10 responded, "I been thinking about that now. I was just wondering if it would affect me in any way. Of course, I believe it's my responsibility to be fair and impartial and I been trying to do that for the full length of this case. I don't think I could make that decision right away. I think I have to just think about it and try to put it out of my mind."

The trial court asked Juror No. 10 to clarify if he was saying that he was *not sure* if he could be fair and impartial if he were to remain a juror. Juror No. 10 responded, "No, that's not what I'm saying. What I'm saying is, you know, you have seen something, now you try to remove it from your mind. And not, you know, affect you in any kind of way. So, no, I am not saying I can't be fair and impartial."

The trial court asked Juror No. 10 if he was saying that he *could* be fair and impartial if he were to remain as a juror. Juror No. 10 responded, "I said I need some time to think about it."

After more questioning, Juror No. 10 stated he was "a little upset" about being questioned. The trial court asked Juror No. 10 if his position was that he needed time to decide if he could be fair and impartial. Juror No. 10 responded, "[Y]ou know, I try to carry myself in a fair and impartial way. I go about doing everything I do, I don't like to have anything, any kind of outside influence. But I felt it was proper that I mention to the court that I had seen that article inadvertently. Gosh, you know, [we] have [had] so much information thrown at us the last couple of months, all I can do is say that I will try my best to do what you ask me to do."

After excusing Juror No. 10 from the courtroom, the trial court expressed concern that Juror No. 10 was not able to clearly state he would be fair and impartial if he continued as a juror in the case. The court concluded there was a "demonstrable reality" of Juror No. 10 not being able to follow the court's instructions because (1) he failed to follow a prior admonition from the court; (2) he could not give an unequivocal answer about his ability to be fair and impartial; and (3) he became upset when being questioned by the court.

The court asked Plaintiffs' counsel if he had an objection to state for the record. Plaintiffs' counsel said, "I didn't really have an objection that I was going to state for the record as much as I was just going to suggest . . . an alternative proposal." Plaintiffs' counsel proposed allowing Juror No. 10 to sit through closing arguments, and then ask him before deliberations if he could be fair and impartial—in order to give the juror the time he needed to decide about being fair and impartial.

Ford's counsel objected to Plaintiffs' counsel's suggestion. Ford's counsel argued that the primary reason for Juror No. 10 being excused was his failure to follow the trial court's admonition and instruction. Ford's counsel asserted the failure to follow instructions was sufficient to excuse Juror No. 10.

The trial court stated that, given Juror No. 10's responses, it did not see any reason to allow him to remain on the jury because, based on Juror No. 10's answers, it was clear to the trial court he could not be a fair and impartial juror. The trial court excused Juror No. 10. Plaintiffs' counsel objected to Juror No. 10 being excused and suggested that the court follow the alternative path suggested by counsel.

### 2. *Analysis*

Plaintiffs assert the trial court erred by removing Juror No. 10. Specifically, Plaintiffs contend Juror No. 10 should not have been removed because "[t]here was no sufficient proof that Juror No. 10 was biased" and "[t]he evidence of juror misconduct in this case is gossamer thin." We disagree.

■ If a juror upon good cause is found to be unable to perform his duty, then the court may order that the juror be discharged. (Code Civ. Proc., § 233.) Our Supreme Court has held that an appellate court should review a trial court's decision to dismiss a juror for an abuse of discretion. (*People v. Williams* (2001) 25 Cal.4th 441, 448 [106 Cal.Rptr.2d 295, 21 P.3d 1209].) Our high court has explained that a juror's inability to perform his duties " 'must " 'appear in the record as a demonstrable reality.' " [Citation.]' [Citation.]" (*Ibid.*) Accordingly, if there is evidence, supporting a finding of a demonstrable reality, then we must conclude the trial court did not abuse its discretion. (*Ibid.*)

Juror No. 10 stated that when he looked at the newspaper, he initially saw the photograph of the car accident and he was not going to read the caption, but then he "just read through it." It appears from the juror's statement he knew he should not have read the caption, but chose to anyway—consciously disregarding the trial court's admonition. Further, when the trial court questioned Juror No. 10 about his ability to be fair and impartial, the juror provided equivocal answers; he seemed unable to commit to being fair and impartial. Based upon the record, we conclude there is a "demonstrable reality" that Juror No. 10 was unable to perform his duties, because (1) he consciously disregarded the trial court's admonition, and (2) he could not commit to being fair and impartial. Accordingly, we conclude the trial court did not abuse its discretion.

Plaintiffs assert there is no evidence that Juror No. 10 was biased towards a particular party. Plaintiffs' argument is not persuasive because the problem with Juror No. 10's statement is that he did not follow the admonitions of the trial court, and he could not commit to not being swayed by the newspaper article. In other words, while Juror No. 10 may not have admitted to being biased, he also did not admit he was able to be fair and impartial during the trial. Accordingly, we are not persuaded by Plaintiffs' argument that Juror No. 10 was not biased.

Next, Plaintiffs contend Juror No. 10 should not have been dismissed because the jury was shown "numerous photographs of the Mansur wreck." Again, Juror No. 10 was dismissed because he did not follow the admonitions of the trial court, and he could not commit to not being swayed by the newspaper article. If Juror No. 10 had explained that he could be impartial because the newspaper photograph was no worse than the photographic evidence, then perhaps, on such a hypothetical record, we would understand if the trial court did not dismiss Juror No. 10. However, that is not the state of the instant record. In this case, Juror No. 10 was equivocal about whether or not he could be fair and impartial. Accordingly, we are not persuaded by Plaintiffs' argument.

Next, Plaintiffs argue the trial court should have (1) obtained a copy of the newspaper article, and (2) given Juror No. 10 time to decide if he could be fair and impartial. We do not find Plaintiffs' argument to be persuasive, because the question on appeal is whether the trial court abused its discretion, specifically, whether substantial evidence supports the trial court's reasoning. (*People v. Williams, supra,* 25 Cal.4th at p. 448.) We do not question whether the trial court should have obtained more evidence or whether the trial court should have followed a different procedure. Juror No. 10's equivocal responses and admission that he disregarded the trial court's admonition constitute substantial evidence that Juror No. 10 was unable to perform his duty.

## C. *Evidence*

### 1. *Motion In Limine*

#### (a) *Procedural History*

During motions in limine, on May 21, 2009, Ford moved to exclude evidence of the UN46 Explorer (the UN46). Ford argued the UN46 was the first-generation Explorer that was manufactured from mid-1990 until 1994. The second-generation Explorer, known as UN105, was manufactured from early 1995 through the 2001 model year. Ford argued the 1996 Explorer—the model year involved in this case—was a UN105 unit, not a UN46 unit, and therefore evidence of the UN46 was not relevant.

In their opposition, Plaintiffs noted that Ford introduced an SUV known as the Bronco II in 1983. The Explorer eventually replaced the Bronco II. Plaintiffs argued that Ford replaced the Bronco II with the Explorer because the Bronco II "had a demonstrated rollover problem." Plaintiffs asserted the Bronco II and the UN46 "were tested side by side during development." Plaintiffs asserted the only difference between the UN46 and the UN105 "is the use of a different front suspension system . . . and a change in the type of steering mechanism." Plaintiffs argued the UN46 and UN105 were also "tested side by side." Plaintiffs asserted all decisions about the performance of the UN105 were tied to the performance of the UN46.

Plaintiffs argued that since their case was based on the design of the UN105, or 1996 Explorer, evidence related to the Bronco II and the UN46 was relevant, because the evidence would show how the UN105 was designed, when it was designed, why it was designed in a particular manner, and Ford's knowledge of the risk associated with the design. In other words, Plaintiffs argued the evidence would be "relevant to the issues of design, performance, foreseeability, and Ford's conduct."

Attached to Plaintiffs' opposition was a declaration from an expert familiar with Ford's design of the Explorer. The expert, Mark Arndt, declared that he was familiar with the 1991 through 2005 model years of the Explorer. Arndt offered his opinion as to whether the UN46 model was different than the UN105 model. Arndt noted the UN46 and UN105 model years of the Explorer were produced in two-wheel drive and four-wheel drive configurations; both had two-door and four-door models; and both had "basically the same" "track width and vertical center of gravity height at curb weight." Arndt confirmed that the UN46 employed a different suspension system than the UN105. Arndt explained the UN46 had a "Twin-I-Beam front suspension system," while the UN105 was "equipped with a short-long arm or 'SLA' front suspension system." Arndt noted that there were "minor" differences between the UN46 and UN105 steering systems, as well as various cosmetic variances. Arndt concluded the UN46 and UN105 were "common vehicles and substantially similar by design."

On June 1, 2009, the trial court held a hearing on the motion in limine. During argument, Ford asserted, "The UN46 is a very different vehicle from the UN105 vehicle specifically as it relates to handling and stability. It has a completely different front end suspension." Ford further argued the UN105 "had different steering gears, rack and pinion and a whole bunch of other changes that affect how that vehicle performs in testing on track and different sort of maneuvers."

In response, Plaintiffs argued that in "respect to the issues in this case, restraint, roof, and rollover resistance" there was no difference between the UN46 and the UN105. Plaintiffs noted that Arndt had declared the UN46 and UN105 shared "an unreasonable tendency to rollover in foreseeable turning maneuvers and an unreasonable tendency to be uncontrollable in emergency situations." Plaintiffs argued the change in suspension systems and steering mechanisms did not change the vehicle's rollover resistance.

The trial court stated that mentioning the UN46 would be unavoidable during trial; however, the court did not want the trial to include a minitrial about the safety of the UN46, since that vehicle was not at issue. For example, the court said it was "willing to allow evidence by way of testimony from experts for both sides, Ford personnel with regard to the existence of [the] UN46 vehicle to the extent some discussion is necessary," so long as counsel was not offering the evidence to show the UN46 was a safe or unsafe vehicle.

The court asked counsel if they had comments on the ruling. Ford's counsel stated the court's ruling gave the parties "appropriate and sufficient guidance." The court specifically asked Plaintiffs' counsel, "does that help at

all in terms of . . . ." Plaintiffs' counsel responded, "Yeah, I think it does. I think it does. It's like some of the comparative evidence you were talking about earlier, it's a question of degree." The trial court responded, "Exactly." Plaintiffs' counsel explained that he would not "show 47 depositions all focused" on the UN46. The court said, "All right," and then moved on to other topics.

### (b) Analysis

#### (1) Hearing

Plaintiffs contend the trial court erred by "prejudging the admissibility of evidence on a motion in limine." Specifically, Plaintiffs assert the trial court "improperly converted a motion in limine into a[n Evidence Code] section 402 hearing." We disagree.

■ " 'Motions *in limine* are a commonly used tool of trial advocacy and management in both criminal and civil cases. Such motions are generally brought at the beginning of trial, although they may also be brought during trial when evidentiary issues are anticipated by the parties. In either event, they are argued by the parties, either orally or in writing or both, and ruled upon by the trial judge. The usual purpose of motions *in limine* is to preclude the presentation of evidence deemed inadmissible and prejudicial by the moving party. A typical order *in limine* excludes the challenged evidence and directs counsel, parties, and witnesses not to refer to the excluded matters during trial. [Citation.]' " (*Kelly v. New West Federal Savings* (1996) 49 Cal.App.4th 659, 669 [56 Cal.Rptr.2d 803].) In other words, motions in limine are typically motions addressing issues related to whether certain evidence should be admitted during trial.

The trial court addressed the admissibility of evidence during the motion in limine, which is proper. Plaintiffs do not explain why it is improper to make an evidentiary ruling as part of a motion in limine; rather, Plaintiffs just provide the conclusion that such an action was "plain error." Since Plaintiffs do not provide a reasoned argument, we find their assertion to be unpersuasive.

#### (2) Evidentiary Ruling

Plaintiffs contend the trial court "severely limited the evidence [they] were allowed to present concerning the known problems with the Ford Explorer . . . ." We address Plaintiffs' argument in two ways: (1) the failure to raise a reasoned argument in their opening brief; and (2) the problem of raising new theories in the reply brief. In both respects, we conclude Plaintiffs' contention fails.

(i) *Appellants' Opening Brief*

As set forth *ante*, in their opening brief plaintiffs contend the trial court "severely limited the evidence that the plaintiffs were allowed to present concerning the known problems with the Ford Explorer." We conclude that this complaint about the trial court's ruling does not assert a legal error.

The burden is on the party complaining of a trial court's alleged error to establish the trial court abused its discretion when making an evidentiary ruling. (*Buell, supra*, 141 Cal.App.4th at p. 542.) Plaintiffs cite to *Buell* to support their argument. In *Buell*, the plaintiff was involved in a rollover accident in her Ford Explorer. As the Explorer rolled, the roof crushed in. (*Id.* at p. 533.) On appeal, Ford argued the trial court erred by allowing the plaintiff to present evidence related to the Bronco II. (*Id.* at p. 541.) The appellate court concluded that the trial court did not abuse its discretion by admitting the evidence, because the Bronco II "evidence was relevant to prove that Ford knew it was designing and manufacturing a vehicle with the same stability design defects as the Bronco II. It was also evidence that could establish malice, fraud and oppression necessary for punitive damages." (*Id.* at p. 543.)

While Plaintiffs complain the trial court limited their evidence, and point out that such evidence was allowed in another case, they do not provide a reasoned analysis in their opening brief regarding why, in this case, the trial court was acting outside the bounds of reason by limiting the evidence related to the UN46. (See *Stull v. Sparrow* (2001) 92 Cal.App.4th 860, 864 [112 Cal.Rptr.2d 239] [Fourth Dist., Div. Two] ["An abuse of discretion occurs only where it is shown that the trial court exceeded the bounds of reason."].) Rather, Plaintiffs contend the trial court's ruling "was error." Due to Plaintiffs' failure to explain how the trial court erred, we deem the argument related to the evidentiary ruling to be waived. (*Lake Almanor Associates L.P. v. Huffman-Broadway Group, Inc.* (2009) 178 Cal.App.4th 1194, 1202 [101 Cal.Rptr.3d 71].)

(ii) *Appellants' Reply Brief*

In their reply brief, Plaintiffs raise two arguments regarding why the trial court's ruling might have been erroneous: (1) the trial court applied the wrong standard, in that the court applied a "strict similarity" standard when comparing the UN46 and UN105, rather than a "substantial similarity" standard; and (2) the evidence was admissible for purposes of proving punitive damages. These theories of error were not specified in their opening brief. Plaintiffs do not offer an explanation as to why these arguments were not specified in the opening brief. We will not consider arguments raised for

the first time in a reply brief, because it deprives Ford of the opportunity to respond to the argument. (*Las Lomas Land Co., LLC v. City of Los Angeles* (2009) 177 Cal.App.4th 837, 855 [99 Cal.Rptr.3d 503]; see also *Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764 [60 Cal.Rptr.2d 770].) In sum, we conclude that Plaintiffs' contention fails.

### 2. *Ruling During Trial*

#### (a) *Procedural History*

During trial, Plaintiffs played portions of the videotaped deposition of Thomas Baughman, head of engineering for Ford's truck operations. Baughman's deposition included testimony regarding Ford's decision to widen the track width for the 2002 Ford Explorer. Baughman testified the track was widened in order to accommodate new power train technology, which included a 4.6 liter modular V8 engine. Baughman stated the wider track likely resulted in the vehicle being more stable.

During trial, Ford's counsel complained Plaintiffs showed a portion of Baughman's deposition that was not included in the approved, edited version of the transcript. Specifically, Ford complained Plaintiffs showed a portion of the deposition related to "the handling and stability of the design of the [2002] Explorer, and specifically, widening the track width." Ford's counsel argued they were "sandbagged" by Plaintiffs' "gamesmanship" and presentation of the unapproved evidence. Ford requested that the trial court strike the evidence.

Plaintiffs argued the evidence should not be stricken because (1) there was no objection raised at the time the deposition video was played to the jury, and (2) Ford opened the door to the 2002 design changes being discussed when it offered its own evidence regarding the 2002 design changes.

The trial court stated it had been working on the assumption that counsel reached agreements about the portions of the videotaped depositions that would be played to the jury, and that any disagreements would be referred to the court. The trial court asked if Plaintiffs played an unapproved portion of Baughman's testimony to the jury. Plaintiffs stated agreements were reached with regard to direct examination testimony, but not cross-examination testimony, and the unapproved portion was played during the cross-examination of a Ford witness. Ford argued they had objected throughout the trial to Plaintiffs presenting evidence of design changes to the 2002 Explorer, and it was not fair for Plaintiffs to "slid[e]" in the evidence, and then treat it as "fair game" during closing arguments.

The trial court stated the following when making its ruling: "Only that portion of Mr. Baughman's deposition testimony talking about the track

width modification of the later model Ford Explorer is being objected to. I think all I need to do is order it stricken. You are certainly going to be free to argue, as your witnesses indicated, that all of these changes, including increasing the track width of the Ford Explorer, were available and technologically feasible and relatively inexpensive. [¶] I am not going to get into whether or not this was thrown in at the last minute for some inappropriate purpose or anything else along those lines. That's not a line of inquiry I am going to embark on."

Following the trial court's ruling, Plaintiffs argued the trial court should strike all of Ford's evidence related to the 2002 Explorer, because "[i]f we strike any of it, we have to strike all of it." Plaintiffs pointed to portions of testimony by two witnesses related to the 2002 Explorer. The court ordered the relevant portions of the witnesses' testimony be stricken.

(b) *Analysis*

Plaintiffs contend the trial court erred by excluding evidence of subsequent design changes. Plaintiffs assert, "[e]vidence of post-manufacture design changes is unquestionably relevant to proving defect" under the risk-benefit test. We infer that Plaintiffs' argument is intended to focus on the ruling on the motion to strike.[5]

The problem with Plaintiffs' argument is that it is different from the argument raised below. The motion to strike was based upon Ford's contention they were "sandbagged" by Plaintiffs' "gamesmanship" and presentation of the unapproved evidence. In turn, Plaintiffs argued the motion to strike should not be granted because (1) Ford should have objected at the time the evidence was offered, and (2) Ford opened the door to evidence related to the 2002 design changes.

The motion to strike arguments did not relate to the relevance of the evidence. Accordingly, Plaintiffs are precluded from arguing on appeal that the trial court erred in ruling on the motion to strike because the evidence was relevant. The argument needed to be raised for the first time at the trial court. (*McKee v. Orange Unified School Dist.* (2003) 110 Cal.App.4th 1310, 1320 [2 Cal.Rptr.3d 774].)

---

[5] Plaintiffs' opening brief contends the trial court erred by precluding Plaintiffs from presenting evidence related to the 2002 design changes. The only specific item of evidence discussed by Plaintiffs is Baughman's testimony. We infer Plaintiffs' contention relates to the motion to strike, as opposed to a different evidentiary ruling by the court, since the argument seems focused on Baughman's testimony and the record references are to the motion to strike. However, we note that it is not clear what exact ruling Plaintiffs are contending was erroneous.

## DISPOSITION

The judgment is affirmed. Defendants and Respondents are awarded their costs on appeal.

McKinster, Acting P. J., and Codrington, J., concurred.

Appellants' petition for review by the Supreme Court was denied November 16, 2011, S196439.