Filed 5/22/20; Certified for publication 6/16/20 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| GARY VERRAZONO,<br><br>        Plaintiff and Appellant,<br>v.<br><br>GEHL COMPANY, et al.,<br><br>        Defendants and Respondents. | A152318<br><br>(Sonoma County<br>Super. Ct. No. SCV256870) |

Plaintiff Gary Verrazono was seriously injured when a rough terrain forklift he was operating tipped over. He proceeded to trial against Gehl Company, the manufacturer. The jury returned a defense verdict, finding the forklift was not defective and Gehl was not negligent. Verrazono claims the trial court erred in refusing to instruct the jury on the "consumer expectations" test for design defect and erred in giving a "dynamite instruction" when the jury became deadlocked. He also maintains no substantial evidence supports the jury's no-defect and not-negligent findings. We affirm.

## BACKGROUND

Verrazono was seriously injured in 2012 at the Sonoma Raceway when the rough terrain forklift he was operating tipped over.

Known as a "telehandler," a rough terrain forklift is a forklift that can "go off of a paved surface" and has a "telescopic boom [that can] be raised and

1

extended to take loads to elevations." The telehandler operated by Verrazono weighed about 28,000 pounds. It could lift a load of up to 8,000 pounds and raise it 42 feet above ground.

The telehandler had a "[r]oll over [p]rotective [s]ystem," consisting of "a ste[e]l cage around the operator." It was also equipped with a two-point seatbelt, which Federal Occupational Safety and Health Administration (OSHA) regulations require the operator to wear. Additionally, it had a "frame level system" allowing the operator "to flatten out the forklift to match up to the slope up to about 10 degrees." The operator's manual instructed that the telehandler should not be operated on slopes exceeding 10 degrees. It also warned the operator "should not travel with the boom elevated," and doing so could lead to instability and rollovers. While the telehandler had been sold with a door, it had been removed at some point prior to the incident.

The telehandler had a number of warning stickers on it. One stated "WARNING [¶] OVERTURN HAZARD [¶] Always fasten seatbelt. [¶] Inspect worksite to be sure ground is stable. [¶] Before raising boom: [¶]. . . Consult load charts. . . .[¶]. . . [¶] . . . Level frame. [¶] . . . [¶] If machine overturns, DO NOT jump. Instead, hold on tight and lean away from fall." Another stated, "WARNING [¶] Machine rollover hazard. [¶] Always level machine before elevating boom. Never level frame to position an elevated load. [¶] Failure to heed could result in death or serious injury." (Capitalization omitted.)

OSHA regulations require that operators be trained and certified by an approved instructor before operating a telehandler. Only "authorized operators trained to adhere strictly to the operating instructions . . . [are] permitted to operate rough terrain forklift[s]."

Verrazono was trained in operating both regular forklifts and telehandlers. He was first trained in operating a telehandler in 2002 and was trained and re-certified every other year from 2002 through 2010. The trainings consisted of classroom instruction, videos, actual operation of the rough terrain forklift in the field with an instructor, and a written test. At the time of the accident, Verrazono had about 1,000 hours of experience operating telehandlers.

On the day of the accident, a chef asked Verrazono to move some industrial ovens in the VIP area of the racetrack, which was surrounded by a fence. Verrazono wanted to use a standard industrial forklift but could not find one that was unlocked. Although not his first choice, he found that the Gehl telehandler was available and he knew it could lift the ovens.

Verrazono testified he performed a general inspection of the telehandler, including checking the hydraulic fluids and tires. Although it was his practice to wear the seatbelt, he was not wearing it at the time of the accident. He also knew the telehandler should not be operated on a slope or grade that was more than 10 degrees. The grade where the accident occurred ranged from 25 to 33 degrees. Verrazono also knew the telehandler should not be moved with the boom in an elevated position, but the evidence showed that at the time of the accident the boom was elevated about 27 degrees above horizontal.

A coworker helped Verrazono find a way through the fence to reach the ovens. When the coworker noticed the telehandler was getting close to the fence, he signaled Verrazono to stop. The two strategized for five to ten minutes on how best to get the telehandler through the fence.

Verrazono started to back up, and after he had backed two-to-three feet, his coworker heard a "screeching sound . . . the sound of metal giving

3

out." The telehandler fell on its left side. As the telehandler was coming down, the coworker saw Verrazono "falling out of the forklift."

Verrazono's right shoulder and right leg were pinned under the forklift for about 48 minutes, resulting in the amputation of his right arm and leg.

Verrazono subsequently filed the instant case, alleging as to Gehl, claims for negligence and strict product liability based on design defect. As to the latter, Verrazono did not claim that the telehandler was defective because it could roll over. Rather, he claimed it was defective because he had not been restrained within the cab. Specifically, he maintained the forklift should have been equipped with a nonremovable door, a seatbelt with more than two-point attachment, and interlocks which would "prevent the operation of the forklift without a door or lap belt."

In support of Verrazono's theory that the telehandler was defectively designed because it lacked these additional features, his engineering expert Steven Meyer opined that wearing the seatbelt would not have, alone, prevented Verrazono's injuries. However, had there been a door, Verrazono "would have not gotten out of it during the tip-over." Meyer also testified the telehandler should have had an interlock device, which would have prevented the operator from either starting the telehandler, putting it in drive, or extending the boom, unless the operator had the seatbelt on.

Verrazono's biomechanical expert, Wilson Carlyle Hayes, similarly testified that a door "would have prevented getting [Verrazono's] arms and legs out of the vehicle, would have prevented amputation." Had there been a door, "the most severe injury he would sustain . . . would be a mild to moderate injury of the . . . head." He further testified that wearing a seatbelt would only "trade off a high shoulder amputation and the entire arm for a lower amputation to the right arm."

4

Gehl's experts had different opinions. Its engineering expert John Johnson testified "the best thing for the operators is wear your seatbelt, stay with the lift." A door was not as effective because "it does not hold you in the seat. And it doesn't do anything for you in a forward direction or [a] backward direction. Or in the rollover, it doesn't do anything for you when the truck is on its top. . . . The seatbelt [is] really what holds you in place. The door is okay but what holds you in place from being injured is the seatbelt." Verrazono, himself, acknowledged that the instructors in his telehandler classes stressed the importance of always wearing the seatbelt because it was "one of the key safety devices to keep you in the cab." The two-point seatbelt complied with both California state and industrial standards. And, had Verrazono been wearing it, he would not have fallen from the cab. Moreover, making the door nonremovable would have prevented certain kinds of repair work to the telehandler, and would have "void[ed] the structure." An interlock device preventing the machine from being started if the seatbelt was not buckled would not prevent unbuckling while the engine was on, and if it automatically shut down on unbuckling, there would be "extreme difficulty steering and braking."

In addition to being instructed on the importance of wearing the seatbelt, Verrazono was also trained that, in the event of a tip-over, the operator should never jump out because, as he testified, "you can get killed." Indeed, he correctly answered the training test question on what to do in the event of a rollover, namely, "remain seated with a firm grip on the steering wheel." The operator's manual also warned users to hold on and lean away from the direction of the rollover.

Verrazono testified he could not recall whether he fell or jumped out of the cab during the accident. His biomechanical engineer opined Verrazono

5

did not jump out of the cab, but rolled out of his seat when the telehandler tipped.

Gehl's biomechanical engineer conducted a "fall analysis" and testified to the contrary. "I don't believe there's any way that Mr. Verrazono could have passively fallen out of the machine based on where he wound up. To get as far as he got would require some effort on his part."

Following the defense verdict, Verrazono moved for a new trial on three grounds—the court erred in refusing to instruct on the "consumer expectations" test, the court erred in giving the "dynamite" instruction when told the jury was unable to reach a verdict, and the verdict was "against the weight of the evidence." The court denied the motion.

## DISCUSSION

### *Instruction on Consumer Expectations Test*

Verrazono claims that while a rollover was "foreseeable" to an operator, "what was not expected was that, upon rolling over, the operator would be ejected from the operator cage and subjected to the severe injuries that [he] suffered." He thus maintains the trial court should have instructed the jury on the "ordinary consumer expectations" test, in addition to the "risk-benefit" test, to resolve his design defect claim.

In *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 560–567 (*Soule*), our Supreme Court engaged in an extensive review of the development of the design defect theory of products liability and elaborated on its watershed decision in *Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413 (*Barker*), which recognized "two alternative tests" to establish a design defect—the "ordinary consumer expectations" test and the "risk-benefit" test. "In *Barker,* we offered two alternative ways to prove a design defect, each appropriate to its own circumstances." (*Soule,* at p. 566.)

6

The Supreme Court devoted much of its discussion in *Soule* to explaining when it is "appropriate" to instruct on the ordinary consumer expectations test and when it is not.

"[I]n order to establish a design defect under *Barker's* ordinary consumer expectations test," it is "enough [for the plaintiff] to show 'the objective conditions of the product' so that the jurors can employ '[their] own sense of whether the product meets ordinary expectations as to its safety under the circumstances presented by the evidence." (*Soule, supra,* 8 Cal.4th at p. 563.) The *Barker* court also pointed out that under the ordinary consumer expectations test, the defectiveness of a product must be evaluated in light of its " 'reasonably foreseeable use,' " not the product's " 'intended use.' " (*Barker, supra,* 20 Cal.3d at 435.) "[T]he adequacy of a product . . . 'should not be carried out in an industrial vacuum, but with recognition of the realities of their everyday use.' " (*Id.* at p. 426, fn. 9.)

*Soule* pointed to the high court's earlier opinion in *Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, as an appropriate use of the ordinary consumer expectations test. In that case, the plaintiff was injured when she was thrown from her seat as the bus she was riding in made a sharp turn, and her complaint was that "there was no 'grab bar' within easy reach of her seat." (*Soule, supra,* 8 Cal.4th at p. 563.) The jury, *Soule* explained, was fully able to assess the situation by looking at photographs of the interior of the bus showing where safety bars and handles were installed. " 'Indeed,' " it was " 'difficult to conceive what testimony an "expert" could [have] provide[d]' " in *Campbell* given the circumstances and nature of the claimed defect. (*Ibid.*)

The *Soule* court went on state that *Campbell* also illustrates that "a product violates ordinary consumer expectations only when the

7

circumstances arouse such reasonable expectations based on common experience of the product's users." (*Soule, supra,* 8 Cal.4th at p. 564.) "[T]he consumer expectations test," said the court, "is reserved for cases in which the *everyday experience* of the product's users permits a conclusion that the product's design violated *minimum* safety assumptions, and is thus defective *regardless of expert opinion about the merits of the design.* It follows that where the minimum safety of a product is within the common knowledge of lay jurors, expert witnesses may not be used to demonstrate what an ordinary consumer would or should expect. Use of expert testimony for that purpose would invade the jury's function (see Evid.Code, § 801, subd. (a)), and would invite circumvention of the rule that the risks and benefits of a challenged design must be carefully balanced whenever the issue of design defect goes beyond the common experience of the product's users." (*Soule*, at p. 567.)

In short, "[i]n particular circumstances, a product's design may perform so unsafely that the defect is apparent to the common reason, experience, and understanding of its ordinary consumers. In such cases, a lay jury is competent to make that determination." (*Soule, supra*, 8 Cal.4th at p. 569.) This can be so even where a product is "complex." " '[A] complex product "may perform so unsafely that the defect is apparent to the common reason, experience, and understanding of its ordinary consumers." ' " (*Mansur v. Ford Motor Co.* (2011) 197 Cal.App.4th 1365, 1374 (*Mansur*), quoting *Saller v. Crown Cork & Seal Co., Inc.* (2010) 187 Cal.App.4th 1220, 1232 (*Saller*).)

However, where the "plaintiff's theory of defect seeks to examine the behavior of 'obscure components under complex circumstances' outside the ordinary experience of the consumer, the consumer expectation test is inapplicable; and defect may only be proved by resort to the risk-benefit

analysis. ([*Soule, supra*, 8 Cal.4th] at p. 570 [where automobile collision resulted in left front wheel breaking free, collapsing rearward and smashing floorboard into driver's feet, it was error to instruct jury with consumer expectation test; proper test for defect is risk-benefit because behavior of obscure component parts during complex circumstances of accident not within ordinary experience of consumer]; *Morson v. Superior Court* (2001) 90 Cal.App.4th 775, 793–795 . . . [consumer expectation test inapplicable to assess defect in latex glove where chemical in the rubber caused allergic reactions in those sensitive to latex; the allergenicity of the rubber is ' "a matter beyond the common experience and understanding" ' of the product's consumers].)" (*McCabe v. American Honda Motor Co.* (2002) 100 Cal.App.4th 1111, 1122.)

The risk-benefit test, by contrast, comes into play where "a complex product, even when it is being used as intended, may often cause injury in a way that does not engage its ordinary consumers' reasonable minimum assumptions about safe performance. For example, the ordinary consumer of an automobile simply has 'no idea' how it should perform in all foreseeable situations, or how safe it should be made against all foreseeable hazards." (*Soule, supra,* 8 Cal.4th at pp. 566–567, citing *Barker, supra,* 20 Cal.3d. at p. 430.) In such cases, whether a design defect exists "involves technical issues of feasibility, cost, practicality, risk, and benefit [citation] which are 'impossible' to avoid" and the "jury must consider the manufacturer's evidence of competing design considerations." (*Soule,* at p. 567, italics omitted.) "[T]he issue of design defect cannot fairly be resolved by standardless reference to the 'expectations' of an 'ordinary consumer.' " (*Ibid.*)

The prima facie showing a plaintiff must make to proceed under either of these design defect theories differs.

To proceed under the ordinary consumer expectation test, " ' "it is generally sufficient if the plaintiff provides evidence concerning (1) his or her use of the product; (2) the circumstances surrounding the injury; and (3) the objective features of the product which are relevant to an evaluation of its safety." [Citation.] The test is that of a hypothetical reasonable consumer, not the expectation of the particular plaintiff in the case.' " (*Mansur*, *supra*, 197 Cal.App.4th at p. 1375, quoting *Saller, supra*, 187 Cal.App.4th at p. 1232.)

Generally, " '[e]xpert witnesses may not be used to demonstrate what an ordinary consumer would or should expect,' because the idea behind the consumer expectations test is that the lay jurors have common knowledge about the product's basic safety." (*Mansur, supra,* 197 Cal.app.4th at p. 1375.) However, "where the product is in specialized use with a limited group of consumers[,] . . . 'expert testimony on the limited subject of what the product's actual consumers *do expect* may be proper' " because " 'the expectations of the product's limited group of ordinary consumers are beyond the lay experience common to all jurors.' " (*McCabe, supra,* 100 Cal.App.4th at p. 1120, fn. 3.)

To proceed under the risk-benefit test, the plaintiff need make only "a prima facie showing that the injury was proximately caused by the product's design." (*Barker*, *supra,* 20 Cal.3d at p. 431.) On such showing, the burden shifts "to the defendant to prove, in light of the relevant factors, that the product is not defective," given that "most of the evidentiary matters which may be relevant to the determination of the adequacy of a product's design under the 'risk-benefit' standard—e. g., the feasibility and cost of alternative

10

designs—are similar to issues typically presented in a negligent design case and involve technical matters peculiarly within the knowledge of the manufacturer." (*Ibid.*)

In this case, the trial court properly declined to instruct on the ordinary consumers expectations test.

To begin with, Verrazono presented no evidence as to the safety expectations of a "hypothetical reasonable" telehandler user under the circumstances that occurred. While he asserts in his opening brief that it "was not expected . . . that, upon rolling over, the operator would be ejected from the operator cage and subjected to the severe injuries that [he] suffered" and claims he presented "plentiful evidence," lay and expert, that the telehandler failed to satisfy user's minimum safety expectations, the evidence to which he cites consists entirely of his engineering expert's opinions as to why the forklift was supposedly defectively designed and the ease and cost of eliminating the claimed defects.

Rather, Verrazono's engineering expert's testimony bore on a risk-benefit analysis, i.e., "of a particular design versus the benefits." Specifically, he opined the telehandler was defectively designed because it did not have a nonremovable door, which he testified would have cost only $500. He was also of the opinion the telehandler should have had an interlock device, which would have prevented the forklift from being operated without the door closed or the seatbelt on, and a "pretensioner," which would have tightened the seatbelt automatically.

Verrazono's testimony regarding telehandler safety, in turn, consisted of what he was taught in the telehandler operating classes and the information in the telehandler manual. This testimony established that he was well-aware of the risk of a rollover, the necessity of leveling the

11

telehandler and operating it only on slopes of 10 degrees or less, and the necessity of wearing the two-point belt to prevent ejection and injury or death. He also testified the majority of telehandlers he had operated had no door, without any comment on whether this triggered any concern about operator safety.

It is also apparent from the record that this was not a case in which the jury could properly determine, based solely on the objective attributes of the telehandler, whether it was defectively designed in the manner Verrazono claimed. Had the forklift lacked a roll bar or cage and restraint device, it is quite plausible the ordinary consumer expectation test case would have applied, as we would have no difficulty concluding that any reasonable telehandler operator has a minimal safety expectation that the forklift will have features preventing the user from being squashed in a rollover, and the jury could have decided the case based solely on the observable attributes, or lack thereof, of the forklift. Had that been Verrazono's case, it would have been analogous to *Campbell*, in which photos of the interior of the bus showed the placement of grab bars and straps and that none were near the seat from which the plaintiff was thrown during a sharp turn.

However, Verrazono made a different claim—that, in addition to a roll bar and cage, and a two-point lap belt, the telehandler also should have been equipped with a nonremovable door, a belt with more than two-point attachment, and interlocks preventing operation of the forklift without a door or lap belt. As the competing expert testimony at trial showed, whether or not the lack of these features constituted a design defect was not an evaluation the jurors were equipped to make in the absence of expert testimony. Verrazono's expert testified, for example, that the telehandler should have had a nonremovable door and interlock device, while Gehl's head

12

of engineering and expert testified a nonremovable door would present different problems and an interlock device would present other operational hazards. In short, this was not a case where "evidence about the objective features of the product," alone, was sufficient for an evaluation of whether the telehandler was defectively designed in the manner Verrazono claimed. (*Mansur, supra,* 197 Cal.App.4th at p. 1378.) Rather, this was a case where the "ultimate issue of design defect" called "for a careful assessment of feasibility, practicality, risk, and benefit." (*Soule, supra*, 8 Cal.4th at p. 562; see *Morson v. Superior Court, supra,* 90 Cal.App.4th at p. 793 [ordinary consumer expectations test not applicable where "expert testimony will be essential to assist the finder of fact in understanding the pros and cons of Plaintiffs' arguments"].)[1]

Verrazono places considerable reliance on *Demara v. The Raymond Corp.* (2017) 13 Cal.App.5th 545 (*Demara*), which involved, like the instant case, an allegedly defective forklift. Unlike the instant case, it was an appeal

---

[1] We also have considerable doubt that reasonable telehandler operators would minimally expect they would be protected from injury if they operated the forklift on an incline exceeding 10 degrees, with the lift extended, and without wearing the two-point lap belt. (See *Chavez v. Glock, Inc.* (2012) 207 Cal.App.4th 1283, 1311–1312 [while consumers might form minimum safety assumptions concerning handguns, "no reasonable consumer—whether relatively inexperienced with firearms or a seasoned law enforcement officer—would expect an unlockable and loaded weapon, left in ready-to-fire condition in a location accessible to a child or other unauthorized users, not to accidentally discharge"; accordingly, facts of the case did not permit an inference the gun's performance " ' "did not meet the minimum safety expectations of its ordinary users" ' " and plaintiffs could not proceed under ordinary consumer expectations test]; cf. *Soule, supra,* 8 Cal.4th at p. 569, fn. 9 [under ordinary consumers expectation test, trier of fact decides whether product failed to perform as an ordinary user would expect when product is used in an intended or a reasonably foreseeable manner].)

from a defense summary judgment, not from a jury verdict. (*Id.* at p. 549.) In *Demara,* the plaintiff, a warehouse worker, was walking through a warehouse when the "drive wheel" of the forklift at issue ran over his foot. (*Id.* at p. 551.) The forklift had "an open area around the drive wheel with no guards, gates, skirts or bumpers." (*Id.* at p. 550.) And while it had a light that flashed to warn nearby workers, it was located above the driver's compartment, so at certain close distances, it "was not visible to, and was thus ineffective as a warning light for, pedestrians." (*Id.* at p. 556.) The trial court granted summary judgment, ruling among other things that "the consumer expectation test is inapplicable, 'because the minimum safety of the [forklift's] design is not within the common knowledge of ordinary consumers.' " (*Id.* at pp. 551–552.)

The Court of Appeal reversed, pointing out "[t]he two theories [of design defect] are not mutually exclusive, and depending on the facts and circumstances of the case, *both* may be presented to the trier of fact in the same case." (*Demara, supra*, at p. 554.) The court concluded there was a triable issue of fact as to causation, which a plaintiff must prove under either test. (*Id.* at pp. 555–556.) It additionally concluded the trial court erred in ruling that because the forklift was a "complex" piece of machinery, only the risk-benefit test could apply to determine whether it was defectively designed. (*Id.* at pp. 557–558.) As the Court of Appeal pointed out, that a product is "complex" does not foreclose use of the ordinary consumer expectations test. (*Id.* at p. 558.) Rather, the applicability of the test depends on whether the particular facts of the case are such that the jury can " 'employ "[its] own sense of whether the product meets ordinary expectations as to its safety under the circumstances presented." ' " (*Id.* at p. 559.) Further, the test focuses not on the minimum safety expectations of

14

"consumers in general," but on those of the product's users, which in *Demara* included nearby warehouse workers. (*Ibid.*) Given the nature of the claimed defects, the court concluded a jury could assess whether the forklift was defectively designed. (*Id.* at pp. 561–562.) Whether the forklift should have had a safety guard and/or fully visible warning light would "not involve complex or sophisticated technology or an understanding of concepts outside the scope of everyday experiences of the consumers of the product." (*Id.* at p. 562.)

As we have discussed, both the circumstances of the accident that occurred in the instant case and the claimed design defects in the telehandler, are of a different character than the accident and alleged defects in *Demara*, and the trial court correctly concluded the ordinary consumer expectations test was inappropriate here.[2]

### CACI 5013: The Deadlock Instruction

On the third day of jury deliberations, the jury asked for further instruction on negligence. The court provided instruction on the reasonable person standard. On the fourth day of deliberations, the foreperson indicated the jury was still divided and "struggling."

The court then instructed the jury with CACI 5013, as follows: "You should reach a verdict if you reasonably can, and that refers to questions 2

---

[2] Citing *Demara*, Verrazono asserts the trial court "misunderstood" the ordinary consumer expectations test, pointing to the court's comment when denying the instruction, that "the consumer expectation test only applies to products in the experience of the ordinary consumer. And this is not an ordinary consumer that is using the product." Whether the court "misunderstood" the test or was simply inartful in its phraseology, we review the trial court's denial of a jury instruction on the ordinary consumer expectations test de novo. (*Mansur, supra,* 197 Cal.App.4th at p. 1373) And, having done so, we conclude the court did not err in declining to instruct on this test.

15

and 3 and the other questions if it becomes appropriate to answer them. [¶] You have spent time trying to reach a verdict, I realize that, but this case is important to the parties so they can move on with their lives with their matter resolved. [¶] If you're unable to reach a verdict the case will have to be tried before another jury, selected in the same manner and from the same community which you were chosen and at additional cost to everyone. [¶] Please carefully consider the opinions of all jurors, including those with whom you disagree.  Keep an open mind and feel free to change your opinion if you become convinced that it is wrong. [¶] You should not, however, surrender your beliefs concerning the truth and the weight of the evidence. Each of you must decide the case for yourself and not merely go along with the conclusions of your fellow jurors. [¶] I don't know if that helps or not. Please just give it another shot.  See if you can reach a verdict."

Verrazono claims this instruction "had the effect of coercing the jury to reach its defense verdict," as evidenced by the fact the jury reached a verdict fifteen minutes after being read the instruction.

"A trial court may properly advise a jury of the importance of arriving at a verdict and of the duty of individual jurors to hear and consider each other's arguments with open minds, rather than to prevent agreement by obstinate adherence to first impressions.  [Citations.]  But, as the exclusive right to agree or not to agree rests with the jury, the judge may not tell them that they must agree nor may he harry their deliberations by coercive threats or disparaging remarks.  'The court is unauthorized to tell the jury, at any stage of the trial, that they must agree.  The statement of a trial judge to a disagreeing jury that they must arrive at a verdict, or language from which such peremptory order is logically inferred, is plain coercion and an invasion by the court of the province of the jury.  The trial court should not direct such

16

remarks or admonitions to the jury as will tend unduly to hasten them in arriving at a verdict.'" (*Cook v. Los Angeles Ry. Corp.* (1939) 13 Cal.2d 591, 594.)

The California Rules of Court authorize the trial court to give such an instruction to a deadlocked jury. "After a jury reports that it has reached an impasse in its deliberations, the trial judge may, in the presence of counsel, advise the jury of its duty to decide the case based on the evidence while keeping an open mind and talking about the evidence with each other. The judge should ask the jury if it has specific concerns which, if resolved, might assist the jury in reaching a verdict. [¶] . . . [¶] If the trial judge determines that further action might assist the jury in reaching a verdict, the judge may: [¶] (1) Give additional instructions; [¶] (2) Clarify previous instructions; [¶] (3) Permit attorneys to make additional closing arguments; or [¶] (4) Employ any combination of these measures." (Cal. Rules of Court, rule 2.1036(a), (b)(1)–(4).)

"[A]ny coercive effect should be determined by reading the instruction as a whole in light of the surrounding circumstances. Only when the instruction has coerced the jurors into surrendering their conscientious convictions in order to reach agreement should the verdict be overturned." (*Inouye v. Pacific Southwest Airlines* (1981) 126 Cal.App.3d 648, 651 (*Inouye*).)

The court in *Inouye* considered the circumstances surrounding the instruction and concluded they were not coercive. As in this case, "[t]he court did not keep the jury in the jury room for an unreasonably long time after reading the instruction. The jury reached agreement in 15 minutes. The court then polled the jury. Nine jurors said the verdict was theirs without hesitation. [¶] Moreover, examining the instruction line by line [citation] it is

17

clear the charge itself was not coercive. The court told the jury they should reach a verdict if they reasonably could; they should not surrender their conscious convictions of the truth and the weight of the evidence; each juror must decide the case for himself and not merely acquiesce in the conclusion of his fellows; the verdict should represent the opinion of each individual juror; and in reaching a verdict each juror should not violate his individual judgment and conscience." (*Inouye, supra,* 126 Cal.App.3d at pp. 651–652.)

In fact, CACI No. 5013 was "derived in large part from *Inouye.*" (Wegner, et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2019) § 15:137a.) The use note states, "Similar language has been found to be noncoercive in a civil case as long as it is accompanied by language such as that included in the last paragraph of the instruction," regarding jurors not surrendering their beliefs. (CACI No. 5013.)

Given the similarity of the circumstances here to those in *Inouye*, we likewise conclude the instruction and surrounding circumstances here were not coercive.

### *Substantial Evidence*

Verrazono additionally claims no substantial evidence supports the jury's verdict that Gehl was not negligent in designing the telehandler or that the risks of the design did not outweigh the benefits.

"We review the jury's findings of fact for substantial evidence. [Citation.] 'Under the substantial evidence standard of review, we review the entire record to determine whether there is substantial evidence supporting the jury's factual determinations [citation], viewing the evidence and resolving all evidentiary conflicts in favor of the prevailing party and indulging all reasonable inferences to uphold the judgment [citation]. The issue is not whether there is evidence in the record to support a different

18

finding, but whether there is some evidence that, if believed, would support the findings of the trier of fact.'" (*Romine v. Johnson Controls, Inc.* (2014) 224 Cal.App.4th 990, 1000.)

Gehl maintains Verrazono waived any substantial evidence challenge because he failed to set forth in his opening brief all the material evidence pertaining to his negligence and design defect claims, including that damaging to his position. "An appellant challenging the sufficiency of the evidence to support the judgment must cite the evidence in the record supporting the judgment and explain why such evidence is insufficient as a matter of law. [Citations.] An appellant who fails to cite and discuss the evidence supporting the judgment cannot demonstrate that such evidence is insufficient. The fact that there was substantial evidence in the record to support a contrary finding does not compel the conclusion that there was no substantial evidence to support the judgment." (*Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1408.)

In his reply brief, Verrazono did not dispute that, in his opening brief, he presented a one-sided discussion of the evidence. Indeed, in his reply brief, he failed to make any response to Gehl's forfeiture argument.

As Gehl notes, in his opening brief, Verrazono failed to mention the evidence that Gehl manufactured and sold the telehandler at issue with a door, but it was removed at some point after the sale. Verrazono failed to mention testimony that Gehl designed and manufactured the telehandler in conformance with industry standards developed by the American National Standards Institute. Verrazono failed to mention expert testimony that making the door nonremovable would prevent repairs to the telehandler. He likewise failed to cite the evidence that the two-point seatbelt was compliant with California and industry standards and would have prevented his

19

ejection from the cab had he worn it. Verrazono additionally failed to cite the evidence that an interlock device preventing the telehandler from starting if the operator was not buckled up would not have prevented the injury in this case, because the seatbelt could have been removed after the engine was on. Further, an interlock device shutting down the telehandler when a seatbelt was removed, would cause "extremely difficult steering and braking."

In sum, Verrazono's failure to set forth all material evidence forfeited his substantial evidence claims. And, in any event, as Gehl goes on to point out, the evidence Verrazono failed to identify constitutes substantial evidence supporting the verdict.

## DISPOSITION

The judgment is affirmed. Costs on appeal to respondent.

_____

Banke, J.

We concur:

_____

Humes, P.J.

_____

Sanchez, J.

A152318, Verrazono v. Gehl Company

Filed 6/16/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| GARY VERRAZONO,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>GEHL COMPANY, et al.,<br><br>        Defendants and Respondents. | A152318<br><br>(Sonoma County<br>Super. Ct. No. SCV256870) |

BY THE COURT:

The opinion in the above-entitled matter filed on May 22, 2020, was not certified for publication in the Official Reports.  For good cause, the request for publication is granted.

Pursuant to California Rules of Court, rules 8.1120 and 8.1105(c)(2), (3) and (4), the opinion in the above-entitled matter is ordered certified for publication in the Official Reports.

Date: _____                         _____ P.J.

1

Trial Court:   Sonoma County Superior Court

Trial Judge:   Hon. Rene Auguste Chouteau

Counsel:

Esner, Chang & Boyer, Andrew N. Chang and Stuart B. Boyer; Greene, Broillet &
Wheeler, LLP, Geoffrey S. Wells, Tobin M. Lanzetta and Molly M. McKibben for
Plaintiff and Appellant.

Tyson & Mendes, LLP, Susan Lynn Oliver and Raymond Kenneth Wilson; Crivello
Carlson, S.C., Richard T. Orton and Jeffrey T. Nichols; Dryden Margoles & Schimaneck,
Susan E. Foe for Defendants and Respondents.