Filed 6/28/24  Zareh v. County of Los Angeles CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| MEENA ZAREH, | B325355 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC644274)) |
| v. | |
| COUNTY OF LOS ANGELES et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, J. Stephen Czuleger, Judge.  Affirmed.

Alexander Morrison + Fehr, Tracy L. Fehr; Levy Vinick Burrell Hyams, Leslie F. Levy, Sharon R. Vinick and Katherine L. Smith for Plaintiff and Appellant.

David Weiss Law, David J. Weiss, Pamela A. Owen; Pollak, Vida & Barer, Daniel P. Barer and Anna L. Birenbaum for Defendant and Respondent County of Los Angeles.

Sheppard, Mullin, Richter & Hampton, Todd E. Lundell, Tracey A. Kennedy, Ryan J. Krueger and John T. Brooks for Defendant and Respondent University of Southern California.

_____

In February 2016, Dr. Meena Zareh told the University of Southern California (USC) that three months before Guillermo Andres Cortes sexually assaulted her while they were at work at a Los Angeles County (County) hospital affiliated with USC's Keck School of Medicine.  County, who employed Cortes, placed him on leave and began an investigation.  During that investigation, Zareh deleted text messages that she considered unfavorable and provided the altered messages to County.  She also did not make herself available to speak with investigators, and County's investigation was inconclusive.  In the meantime, Cortes threatened legal action based on his involuntary leave, and County allowed Cortes to return to work under instructions that he was not to have unsupervised contact with Zareh.

Zareh sued Cortes, County, and USC for causes of action arising out of Cortes's assault and the manner in which County and USC handled its aftermath, including a cause of action for sexual harassment under the Fair Employment and Housing Act (FEHA; Gov. Code,[1] § 12900 et seq.).  Following a lengthy trial, the jury returned a special verdict finding Cortes liable for sexual battery and awarding Zareh $12 million in compensatory and punitive damages.  The jury found Cortes not liable for sexual harassment.  It also found in favor of both USC and County on all

_____

[1] All unspecified statutory references are to the Government Code.

2

causes of action asserted against them, finding that Cortes was not a supervisor, neither County nor USC ratified Cortes's conduct, and that USC was not Zareh's or Cortes's employer in addition to County.

Zareh's appellate briefing argues substantial evidence does not support the jury's supervisor, ratification, and employer findings and that we should grant a judgment notwithstanding the verdict (JNOV) in her favor against County and USC. She alternatively requests a new trial on her harassment claim against those entities. At oral argument, Zareh abandoned her challenge to the jury's finding that neither County nor USC ratified Cortes's conduct, and thus we do not address that argument further. Thus, assuming USC was also an employer, County's and USC's liability for sexual harassment depends on Zareh prevailing in her challenge to the jury's finding that Cortes was not her supervisor.

Because Zareh had the burden of proof in the trial court, she faces an onerous burden on appeal to show that the trial evidence compelled a finding in her favor as a matter of law. In attempting to satisfy this burden, Zareh has a duty to fairly set forth *all* facts relevant to the issue on appeal, not just those in her favor. As we describe below, she has ignored that duty. We therefore deem her challenge to the jury's supervisor finding forfeited. Moreover, even if we were to consider her argument, the evidence in Zareh's favor is not uncontradicted and unimpeached; instead, substantial contrary evidence supports the jury's conclusion.

Zareh also argues a new trial is warranted as to all her claims against County and USC because USC's counsel committed prejudicial misconduct during closing argument.

Zareh failed to preserve this issue for appeal by not timely objecting to the alleged misconduct. Even if we overlook that failure, Zareh has not demonstrated prejudice from the alleged misconduct. We therefore affirm.

## BACKGROUND

### A.    Events Giving Rise to the Complaint

In November 2015, Zareh was a third-year medical resident in USC's Keck School of Medicine working at the LAC+USC Medical Center, a hospital owned by County.[2] Cortes was a second-year cardiology fellow and thus ahead of Zareh in terms of medical education. On November 17, 2015, Zareh saw a patient in the cardiology intensive care unit who was retaining urine. Zareh sought to advise Cortes of the issue. Cortes directed Zareh to speak with him in a call room. While in the room, Cortes forcibly kissed Zareh and inserted his fingers into her vagina. She repeatedly demanded that he stop, was able to get to the door, and ran out of the room.

On December 7, 2015, Zareh received notice that she was accepted into USC's cardiology fellowship program, which began in July 2016. Because Cortes was also in the program and she wanted to avoid him, on February 18, 2016, Zareh reported Cortes's sexual assault to Dr. Eric Hsieh, director of USC's residency program. County placed Cortes on paid administrative leave, ensured he would not have access to hospital facilities, and began an investigation. County officials contacted Zareh to offer her counseling and wellness resources and spoke to her about

---

[2] LAC+USC Medical Center has since been renamed Los Angeles General Medical Center.

workers' compensation. They informed her about the investigation that would occur, that an incident report had been prepared, and that the matter would be referred to law enforcement.

Zareh hired attorney Lisa Strutman. On Strutman's advice, Zareh did not answer the initial County investigator's questions, required that the initial County investigator be replaced with one who had legal training, and refused to be interviewed without her attorney present. Although County attempted to interview Zareh, County and Strutman could not agree on an interview date, and County thus did not interview Zareh.

As part of its investigation, County requested Zareh's text messages. Zareh claims that during County's investigation Strutman advised Zareh to delete text messages that could negatively impact her case. Zareh deleted 96 messages, some of which were communications from 2013 between Zareh and her friend and colleague, Dr. Lavanya Wusirika, where Wusirika observed that Zareh and Cortes "were flirting like crazy" at a bar. In March 2016, Strutman provided the altered text messages, along with affidavits from Zareh and Wusirika that relied on the altered messages, to County as part of its investigation. There is no evidence that Wusirika, who did not have her copy of the 2013 text messages, knew Zareh had modified the messages before Wusirika used them to prepare her affidavit.

As part of its investigation, County interviewed two nurses, three female cardiology fellows who worked with Cortes, and a resident who was Zareh's friend and with whom Zareh had discussed Cortes's sexual assault shortly after it occurred. All denied experiencing any sexual harassment when interacting

5

with Cortes; none had heard others report inappropriate sexual conduct by Cortes. At trial, County presented evidence it did not have any prior complaints of sexual harassment by Cortes, and thus did not know of his conduct before Zareh reported it.

In April 2016, Cortes's union representative filed a grievance asserting County placed Cortes on leave "without just cause," which threatened his ability to complete his training on time and his position in another fellowship program. Cortes claimed to his union representative that although there was physical contact between him and Zareh, it had been consensual. Cortes's attorney also threatened a lawsuit. County permitted Cortes to return to work on May 31, 2016, with the admonition that he was to avoid unsupervised contact with Zareh. According to the chief of County's investigative unit, "We had done enough that at that moment we knew . . . we were not going to be able to substantiate or not substantiate [what occurred such] that [the investigation] was inconclusive."

Although County allowed Cortes to return to work, it provided Zareh a security escort to and from the hospital. Further, USC endeavored to schedule Cortes and Zareh so that they had different rotations, time off, and on-call days. There were two instances, both of which occurred in the first weeks after Cortes returned, when Cortes and Zareh were at the clinic on the same day. When Zareh called Hsieh to inform him of the second incident, he assured her it was fine for her to leave the clinic, and he would look into what occurred. Zareh testified at trial she was not thereafter scheduled to work in the clinic at the same time as Cortes. The director of USC's cardiology program and Zareh's former mentor, Dr. David Shavelle, considered whether the fellowship program could provide lectures by

webcast and determined it was not feasible. Cortes completed his fellowship program and left LAC+USC in June 2017. On June 12, 2020, Cortes lost his license to practice medicine in California.

## B.     Zareh Sues

On December 16, 2016, Zareh filed a complaint against Cortes, County, USC, and others for claims arising out of Cortes's sexual assault. On December 10, 2019, Zareh filed the operative second amended complaint. It alleged seven causes of action, including sexual battery, sexual harassment, discrimination in postsecondary education, and retaliation, and sought punitive damages against Cortes and USC.

## C.     Use of the Altered Text Messages in Litigation

In June 2017, Zareh produced the altered text messages in the litigation without explanation that she had altered them. In November 2017, Zareh's trial counsel, Sharon Vinick and Leslie Levy, substituted into the matter. In April or May 2018, Zareh produced additional documents, including another version of previously produced text messages that now contained approximately four times as many texts as before. This additional production made the prior alteration of the text messages clear and led defendants to move for terminating sanctions and to disqualify Zareh's counsel. The trial court denied these motions, but it vacated the trial date, reopened discovery, and awarded $36,385 in monetary sanctions against Zareh individually.

In September 2018, Vinick provided the altered text messages to Wusirika in advance of Wusirika's deposition. Wusirika was represented by independent counsel, and Vinick did not explain when providing the documents either that the

messages had been altered or that more complete versions of those text messages had been produced. Wusirika was confronted with the two versions of the text messages at her deposition. Evidence that Zareh had altered her text messages was admitted at trial.

## D. The Verdict and Post-trial Motions

Following a 26-day jury trial, the jury returned a 40-question special verdict form. It found Cortes liable for sexual battery. On Zareh's sexual harassment claim, the jury found Cortes subjected Zareh to severe or pervasive harassment, but that his harassment did not create a hostile work environment. The jury found Cortes was not a supervisor, that USC and County did not ratify Cortes's conduct, that USC did not have an employment relationship with Zareh or Cortes, and that County did not engage in an adverse employment action or retaliation against Zareh. Thus, the jury found USC and County were not liable for Cortes's actions against Zareh. It awarded $11.9 million in compensatory damages and $100,000 in punitive damages to Zareh payable by Cortes individually.

Zareh filed a JNOV motion and a motion for a new trial. She argued the jury's finding that Cortes's conduct did not create a hostile work environment was incongruous with its finding that Cortes committed sexual battery. She further argued the evidence compelled a finding in her favor on her sexual harassment claim against County and USC because Cortes committed sexual harassment, Cortes was a supervisor, and USC

8

was Zareh's and Cortes's employer.[3]  Zareh also argued USC's counsel committed prejudicial misconduct during closing argument warranting a new trial.

On November 10, 2022, the trial court denied Zareh's motions, finding the verdict was not inconsistent and that although reasonable minds could differ, there was substantial evidence to support the verdict.  Zareh timely appealed.

## DISCUSSION

Zareh argues she is entitled to a JNOV on her sexual harassment cause of action because the evidence compelled the jury to find, as a matter of law, that (1) Cortes was individually liable for sexual harassment because his battery created a hostile work environment, (2) Cortes was a supervisor, and (3) USC had an employment relationship with Zareh and Cortes.  She further argues she was entitled to a new trial on all her claims against USC and County because USC's counsel engaged in prejudicial misconduct during closing argument.

A.   **Zareh Forfeited Her Substantial Evidence Challenge, and Cannot Prevail on the Merits in Any Event**

1.   *Standard of Review*

"As the plaintiff who failed to prevail before a jury, [Zareh] faces an extremely high burden on appeal." (*Estes v. Eaton Corp.* (2020) 51 Cal.App.5th 636, 651.)  " 'In a case where the trier of fact has determined that the party with the burden of proof did not carry its burden and that party appeals, "it is misleading to

---

[3] Zareh made her employment argument solely as to USC because County does not dispute that it employed Zareh and Cortes.

9

characterize the failure-of-proof issue as whether substantial evidence supports the judgment." [Citations.]  Instead, "where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law." [Citation.]  Specifically, we ask "whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " ' [Citation.]  This is 'an onerous standard' [citation] and one that is 'almost impossible' for a losing plaintiff to meet, because unless the trier of fact made specific factual findings in favor of the losing plaintiff, we presume the trier of fact concluded that '[the] plaintiff's evidence lacks sufficient weight and credibility to carry the burden of proof.' [Citation.]" (*Ibid.*, italics omitted.) " ' " ' "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." ' " ' [Citation.]  Indeed, 'the jury is not required to believe the testimony of any witness, even if uncontradicted.' [Citation.]" (*Ibid.*)

2. *Zareh Has Forfeited Her Substantial Evidence Challenge to the Jury's Finding that Cortes Was Not a Supervisor*

Zareh focuses her substantial evidence challenge solely on her claim for sexual harassment in violation of section 12940, subdivision (j).  We assume without deciding that the jury erred in concluding Cortes's sexual battery did not create a hostile work environment.  County does not dispute that it employed

Cortes and Zareh, and we assume without deciding that USC was also their employer. Zareh's appellate challenge to the sexual harassment verdict as against County and USC nevertheless fails because she has not provided a fair summary of the relevant evidence concerning whether Cortes was a supervisor, which is a necessary predicate to County and/or USC having liability given that she does not dispute the jury's finding of no ratification.[4] (See *State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1040-1041 ["FEHA imposes two standards of employer liability for sexual harassment, depending on whether

[4] Zareh's opening brief states that she appeals from the judgment "confirming the jury's verdict for USC and . . . County against [her]," and argues Cortes was individually liable for sexual harassment as a link in the chain to establish the alleged liability of the entities. Her reply brief suggests that even if we affirm as to the entities, we should remand for entry of a verdict in her favor against Cortes individually on the sexual harassment claim. We need not address this argument for two reasons. First, Zareh's opening brief makes no reasoned argument supported by authority that we should order a JNOV only as to Cortes, meaning she has forfeited any such claim. (*Mansur v. Ford Motor Co.* (2011) 197 Cal.App.4th 1365, 1387-1388.) Second, regardless of any forfeiture, Zareh articulates no substantial right (most notably any potential change in monetary relief) affected by the jury's sexual harassment verdict against Cortes that would justify remand for further proceedings against only him. (See Code Civ. Proc., § 475 [at every stage of an action, courts must disregard errors that "do[ ] not affect the substantial rights of the parties"]; *Quantum Cooking Concepts, Inc. v. LV Associates, Inc.* (2011) 197 Cal.App.4th 927, 934; *Leoni v. Daley* (1948) 83 Cal.App.2d 303, 309 ["If one count is not affected by error . . . , it is immaterial that there may have been errors committed in connection with another count"].)

the person engaging in the harassment is the victim's supervisor or a nonsupervisory coemployee.  [(1)] The employer is liable for harassment by a nonsupervisory employee only if the employer (a) knew or should have known of the harassing conduct and (b) failed to take immediate and appropriate corrective action. . . . [(2)] FEHA makes the employer strictly liable for harassment by a supervisor."].)  Instead, Zareh provides a completely one-sided recitation that includes only favorable facts and omits any reference to the substantial contrary evidence.  In doing so, she has forfeited her substantial evidence challenge.

"In every appeal, 'the appellant has the duty to fairly summarize all of the facts in the light most favorable to the judgment.  [Citation.]  Further, the burden to provide a fair summary of the evidence "grows with the complexity of the record.  [Citation.]"  [Citation.]'  [Citation.]" (*Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 739; see Cal. Rules of Court, rule 8.204(a)(2)(C).)  "If one is going to make a 'the-facts-compel-that-I-win-as-a-matter-of-law' argument, one's brief must fairly state all the evidence." (*McCauley v. Howard Jarvis Taxpayers Assn.* (1998) 68 Cal.App.4th 1255, 1266.)  A party's failure to do so may be deemed a forfeiture of the substantial evidence challenge, a result we find appropriate here given Zareh's skewed summary of evidence from a 26-day trial.  (*People v. Ashford University, LLC* (2024) 100 Cal.App.5th 485, 503; *Pilliod v. Monsanto Co.* (2021) 67 Cal.App.5th 591, 621.)

> 3.  *Even if Not Forfeited, The Record Discloses Substantial Evidence Supporting the Jury's Finding*

Even if Zareh had not forfeited her challenge, the facts she omitted from her briefing demonstrate the jury's special verdict findings that Cortes was not a supervisor is supported by

12

substantial evidence.  We summarize below Zareh's contentions, before listing some of the relevant unfavorable facts that she omitted from her briefing.

Under FEHA, a " '[s]upervisor' means any individual having the authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or the responsibility to direct them, or to adjust their grievances, or effectively to recommend that action, if, in connection with the foregoing, the exercise of that authority is not of a merely routine or clerical nature, but requires the use of independent judgment."  (§ 12926, subd. (t); see CACI No. 2525 [defining supervisor to include a person who has "[t]he responsibility to direct other employees' daily work activities" when the exercise of that responsibility is not merely routine or clerical, but requires the use of independent judgment].)

Zareh focuses on the portion of the definition stating a supervisor has the responsibility to direct other employees' daily work activities using independent judgment.  She argues the evidence established as a matter of law that Cortes was a supervisor under this definition.  She points to testimony from Hsieh that fellows could "[t]ell the resident what to do in a particular situation," "determine whether a resident is going to perform a certain procedure," and "tell the resident whether they are going to work with a particular patient."  Hsieh agreed that if no attending physician was present or available, the fellow would be in charge and able to make decisions without running them by the attending until after the fact.  Further, Shavelle testified that fellows exercised independent judgment and were not merely performing clerical tasks when "directing the daily work activity"

13

of those junior to them.  Zareh testified she asked Cortes if she could have days off, and that Cortes determined which patients she saw, could direct her plan for the patients, and "could ask her to stay late to finish work."  Another post-graduate physician, Dr. Elizabeth Levy, similarly testified that as a first-year resident, she had a rotation during which she reported to Cortes with respect to all patient care and administrative duties, and he directed her daily work activities and oversaw all the work she did and "co-signed it."

Zareh also asserts that Cortes's "job description required supervision of residents."  She cites to *Chapman v. Enos* (2004) 116 Cal.App.4th 920 for the proposition that Cortes need not have been vested with full accountability and responsibility to be a supervisor and concludes that "[t]he fact that Cortes eventually reported his supervisory and patient care decisions to an attending physician does not change the fact that, as a fellow, he directed the daily activities of less junior fellows and residents." She also observes that fellows could give "input" into the evaluations of other trainees.

Now for what Zareh's evidentiary summary omits.  There was considerable testimony that fellows like Cortes supervised residents like Zareh with respect to patient care only and did so in an educational sense and not in an employment sense. Attending physicians supervised all trainees, including medical students, residents, and fellows.  According to the chief medical officer at LAC+USC Medical Center, Dr. Brad Spellberg, in the absence of the attending physician, the most senior person on the medical team who was present (for example, a fellow), could make clinical decisions.  However, witnesses also testified that fellows had "to run everything by the attending [physician]," that

14

attending physicians were available at all times even if only by phone, and that attending physicians had to authorize a fellow's patient care plan.  Dr. Lawrence Opas testified that within the first 24 hours of a patient's arrival at the hospital, the attending physician was required to discuss with either the fellow or other team member the patient's treatment plan.  Nor does Zareh give necessary context to Shavelle's testimony that fellows exercised independent judgment and did not just perform clerical tasks.  The question Shavelle answered was limited to situations "when the attending[ physician is] not there," and Shavelle further limited his answer to "certain rotations" without describing which ones.  Zareh's friend Wusirika, for example, testified that during her training she considered only attending physicians to be her supervisors.

Although Zareh testified that she asked Cortes if she could have days off, her brief neglects to mention that she also testified that fellows did not have the ultimate authority as to whether she could take time off and that it was insufficient for her to ask only Cortes.  As Zareh acknowledges elsewhere in her brief, Cortes did not have the power to assign her to a particular rotation, as that was done by USC.

As to a fellow's ability to evaluate a resident, Hsieh testified that fellows did so informally, giving "on-the-fly" assessments that may or may not eventually become "peer evaluations."  If a trainee had concerns about another trainee, those concerns had to be brought to the attention of the attending physician before any "remediation" could occur.

Finally, the "job description" to which Zareh referred was a policy on "Resident Working and Learning Environment."  It describes a fellow taking on a supervisory role as part of his or

15

her own development and training. It describes that role not categorically but as situation dependent, stating, "The privilege of progressive authority and responsibility, conditional independence, and a supervisory role in patient care delegated to each resident must be assigned by the program director and faculty members. . . . [¶] . . . [¶] . . . Senior residents or fellows should serve in a supervisory role to junior residents in recognition of their progress toward independence, based on the needs of each patient and the skills of the individual resident or fellow."[5]

In her reply brief, Zareh argues "[t]he facts omitted from the opening brief [were] not germane to the analysis of" whether Cortes was a supervisor. We disagree. The contradictory evidence Zareh failed to include in her opening brief, and to which USC and County cite, provides a basis upon which the jury could disbelieve Zareh's contention that fellows like Cortes

---

[5] Zareh argued for the first time in oral argument that LAC+USC Medical Center's policy and California regulations require residents to be supervised in person at all times, and that unless fellows were considered supervisors, USC and County violated this policy and regulation. This belated argument is forfeited. (See *J&A Mash & Barrel, LLC v. Superior Court* (2022) 74 Cal.App.5th 1, 32, fn. 9 [" ' "[C]ontentions raised for the first time at oral argument are disfavored and may be rejected solely on the ground of their untimeliness" ' "]; *People v. Dixon* (2007) 153 Cal.App.4th 985, 996 ["It is . . . improper to raise issues for the first time in a reply brief or at oral argument"].) Moreover, contrary to Zareh's assertion, the policy states, "Some activities require the physical presence of the supervising faculty member. In some circumstances, supervision may include post-hoc review of resident-delivered care with feedback."

exercised independent judgment in directing the daily activities of junior trainees like Zareh, and instead find that attending physicians were the only ones assigned the responsibility to direct the daily activities of the medical trainees and exercise independent judgment in doing so.

**B.**    **Zareh's Claim of Attorney Misconduct During Closing Argument Does Not Warrant Reversal**

Zareh argues she should receive a new trial because USC's counsel engaged in two types of misconduct during closing argument.  First, defense counsel repeatedly referred to USC's wealth and financial status.  Second, Zareh asserts that defense counsel repeatedly "impugned the integrity and honesty" of her counsel by suggesting they lacked credibility and "were puppet masters," which she characterizes as antisemitic rhetoric.  She argues both instances of misconduct prejudiced her case against USC and that the second prejudiced her case against County.

1.    *General Legal Principles and Standard of Review*

"In conducting closing argument, attorneys for both sides have wide latitude to discuss the case.  ' " ' "The right of counsel to discuss the merits of a case, both as to the law and facts, is very wide, and [s]he has the right to state fully [her] views as to what the evidence shows, and as to the conclusions to be fairly drawn therefrom.  The adverse party cannot complain if the reasoning be faulty and the deductions illogical, as such matters are ultimately for the consideration of the jury." ' " [Citations.] "Counsel may vigorously argue [her] case and is not limited to 'Chesterfieldian politeness.' " [Citations.]  "An attorney is permitted to argue all reasonable inferences from the evidence . . . ." [Citation.]  "Only the most persuasive reasons justify handcuffing attorneys in the exercise of their advocacy

17

within the bounds of propriety." [Citation.]' [Citation.]" (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 795.)

"An attorney who exceeds this wide latitude commits misconduct." (*Cassim v. Allstate Ins. Co.*, *supra*, 33 Cal.4th at p. 796.) Thus, courts have held that "appeal[ing] to [the] social or economic prejudices of the jury, including the wealth or poverty of the litigants, is misconduct where the asserted wealth or poverty is not relevant to the issues of the case." (*Hoffman v. Brandt* (1966) 65 Cal.2d 549, 553.) "Nor may counsel properly make personally insulting or derogatory remarks directed at opposing counsel or impugn counsel's motives or character." (*Cassim v. Allstate Ins. Co.*, *supra*, at p. 796; *Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 295 [" 'Personal attacks on the character or motives of the adverse party, his counsel or his witnesses are misconduct' "].)

"Attorney misconduct is an irregularity in the proceedings and a ground for a new trial." (*Garcia v. ConMed Corp.* (2012) 204 Cal.App.4th 144, 148; see Code Civ. Proc., § 657, subd. 1.) "In ruling on a motion for new trial, a trial court has wide discretion, and we give 'great deference' to that ruling on appeal. [Citation.] However, where a motion for new trial on the ground of attorney misconduct has been denied, as is the case here, we review the entire record to make an independent determination of whether attorney misconduct was prejudicial." (*Pilliod v. Monsanto Co.*, *supra*, 67 Cal.App.5th at p. 631, citing *City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 871-872.) "To demonstrate prejudice, the appellant must show a reasonable probability that a more favorable result would have been achieved in the absence of the attorney misconduct. [Citation.] The reviewing court evaluates the following factors to determine

18

prejudice: ' "(1) the nature and seriousness of the misconduct; (2) the general atmosphere, including the judge's control of the trial; (3) the likelihood of actual prejudice on the jury; and (4) the efficacy of objections or admonitions under all the circumstances." ' [Citation.]" (*Pilliod v. Monsanto Co.*, *supra*, at pp. 635-636.).)

2. *Additional Background*

To place Zareh's challenge in context, we first describe some additional background. On July 15, 2016, after Zareh met with attorneys, she texted her mother and a family friend or uncle named Kambiz Lajevardi, "HUGE CASE." In the next text, she stated, "Sexual harassment, gender discrimination[,] [h]ostile work environment[,] [r]etaliation." Then, on July 20, 2016, Zareh texted Lajevardi that Shavelle filed a grievance against her based on her conduct during a June 30, 2016 meeting in his office.[6] Lajevardi responded, "Good! He throws you out then file[s] a grievance against you! When you are the one who is sexually assaulted! Wow this is fantastic."

---

[6] On June 30, 2016, Zareh and her union representative met with Shavelle in his office. Zareh testified the meeting was to discuss her need to be kept separate from Cortes, and that Shavelle essentially refused to discuss the matter with her and demanded she leave his office. Shavelle testified that Zareh came not to discuss matters but instead read a prepared statement and sought to dictate what Shavelle should do, and became agitated and would not listen to Shavelle. Shavelle eventually asked Zareh to leave his office because the meeting was not productive but Zareh refused, and Shavelle instead left his own office to end the meeting.

On August 24, 2022, the parties presented their closing arguments. In her summation, Zareh's counsel urged the jury to award punitive damages against USC and clarified punitive damages were available against only USC because County was immune from such damages. Counsel also told the jury that USC's medical school "is a big part of USC's business," "the largest school at USC," "has an annual budget of a billion dollars," and "has almost 2,000 employees." Counsel told the jury, "[I]t's your opportunity to tell USC that since they won't step up and take responsibility for what they did, there is a consequence. And that is punitive damages." During USC's closing argument, its counsel told the jury no less than six times that Zareh was pursuing claims against USC because that is where the money was. Zareh's counsel did not object.

USC's counsel presented approximately 74 slides as part of her closing argument, a handful of which related to credibility issues. Zareh's counsel did not object to any of these slides as they were being presented to the jury. One such slide with the heading "Credibility Matters," includes photographs of Strutman, Zareh, Lajevardi, and Zareh's trial counsel, Vinick and Levy. In the middle of the five photographs is a drawing of a hand holding a cross brace and strings like those used to control a marionette. Another slide refers to Zareh deleting 96 text messages, using the altered messages in her affidavit, and sending the altered text messages through Strutman to Wusirika. Another slide includes photographs of Strutman, Vinick, and Zareh positioned in the upper and middle part of the slide. At the bottom of the slide and below the drawing of the cross brace and puppet strings is Wusirika's photograph. The next slide includes a photograph of Vinick and an excerpt of Wusirika's trial testimony that she

20

spoke with Vinick before her deposition, that Vinick provided her with nine screenshots of the altered text messages prior to her deposition, but that Vinick never told her that there were longer versions of the text messages. Another slide depicts Lajevardi, the drawing of the hand holding the puppet cross braces and strings, and the text messages in which he states "Good!" and "Wow this is fantastic" when Zareh tells him Shavelle filed a grievance against her.

USC's counsel then presented a slide with the title "Building a HUGE CASE," referring to Zareh's July 15, 2016 text. The slide included a graphic of a thermometer similar to those used in fundraising appeals, with dollar signs at the bottom. The graphic was animated, so that the thermometer filled up with "money" at the same time as images of various individuals were added, including Zareh, Strutman, Lajevardi, Vinick, and Levy. The text on the graphic does not line up cleanly with the individuals' pictures. Next to the photograph of Levy (who was immediately below Zareh), the text states, "Redacting clearly relevant text messages" and below that says "Oct[.] 2018 . . . attorney (Levy) writing letter to LA Times" to publicize the alleged wrongdoing. Next to the photograph of Vinick, the text reads, "Sept[.] 2018: Vinick only providing altered text messages to Wusirika."

In rebuttal, Zareh's counsel argued, "[USC's] suggestion that this was all about the money, that this was all put together in some grand scheme to go after USC because they had deep pockets . . . [t]hat's not what happened at the time. . . . Zareh . . . was doing everything she could to try to move forward with her education. Besides, a lawsuit . . . it's a bad bet. Why would someone like Dr. Zareh, who worked so hard to become a

21

successful cardiologist, put her entire career on the line for the sake of pursuing a lawsuit that may or may not come to fruition years and years from now?  Why would Dr. Zareh put her mental health and her well-being on the line for the potential of a lawsuit?  That doesn't make any sense."

Addressing the attacks on her, Zareh's counsel told the jury, "As Dr. Zareh testified, when she got new counsel, the counsel who's been sitting in this room for the last five weeks, and whose integrity was impugned today and at other points in this trial, when our firm became involved, as Dr. Zareh testified, we voluntarily turned over all the texts, all the texts that are only here today because Dr. Zareh screenshot them, saved them, and then they were produced when her phones were imaged."  Zareh's counsel also argued that defendants "blamed and badgered" Zareh for all kinds of things, and that it was "easier to blame the victim than for USC and the County to take responsibility."

The next morning, after closings had finished but before the trial court instructed the jury, Zareh's counsel requested that the court give a curative instruction.  They argued USC's counsel repeatedly suggested that Zareh sued USC simply for monetary gain and falsely suggested that trial counsel engaged in unethical conduct, including that Vinick sent the altered text messages to Wusirika.  Levy further argued that much of USC's closing, "particularly the end with the thermometer and the money, was basically a dog whistle to jurors who hold stereotypes about Jews and money."  The court responded, "I did not note nor perceive on any level any type of antisemitism by that last comment.  I saw the thermometer.  I thought it was cute at best, but I don't perceive it as being any type of a dog whistle.  It was what it is,

but I don't see a problem." USC's counsel explained she did not know Vinick and Levy were Jewish. She argued the evidence, in particular Zareh's text messages, supported her statements that "this is all about the money." That the case has no merit, in her opinion, was also based upon the evidence USC presented at trial. She further argued there was no need for a curative instruction because the court would instruct the jury that the arguments of counsel are not evidence.

The court denied Zareh's counsel's request. It ruled the argument was not improper and it did not see a need for any curative instruction.

### 3. *Analysis*

County and USC argue that Zareh did not preserve this alleged misconduct issue for appeal because she failed to raise a contemporaneous objection. We agree.

" 'Generally, to preserve for appeal an instance of misconduct of counsel in the presence of the jury, an objection must have been lodged at trial.' [Citation.] In addition to objecting, a litigant faced with opposing counsel's misconduct must also 'move for a mistrial or seek a curative admonition' [citation] unless the misconduct is so persistent that an admonition would be inadequate to cure the resulting prejudice [citation]. This is so because '[o]ne of the primary purposes of admonition at the beginning of an improper course of argument is to avoid repetition of the remarks and thus obviate the necessity of a new trial.' [Citation.]" (*Cassim v. Allstate Ins. Co.*, *supra*, 33 Cal.4th at pp. 794-795; *Horn v. Atchison, T. & S. F. Ry. Co.* (1964) 61 Cal.2d 602, 609-610 [holding party waived issue of misconduct in closing argument where counsel made no objection during argument].)

23

Zareh points out that she did object at trial, albeit not during USC's closing, and claims this was sufficient to preserve the issue on appeal. The Supreme Court's holding in *People v. Bemore* (2000) 22 Cal.4th 809 states otherwise. There, the prosecutor began his closing argument on Wednesday afternoon. He twice remarked that the defendant's counsel changed his defense theory in response to contradictory evidence. (*Id*. at pp. 844-845.) Thursday morning, the prosecutor continued his closing and again referred to defense counsel's disproved defense theory. (*Id*. at p. 845.) Defense counsel then objected, "complain[ing] that, for the 'third time,' the prosecutor had committed misconduct by accusing counsel of 'changing defenses,' and by implying that 'some sort of dirty trick' was being played on the jury." (*Ibid*.) The trial court overruled the objection. (*Id*. at p. 845.)

In reviewing the issue, the Supreme Court explained, "Such arguments have not been preserved by timely, contemporaneous objection in the trial court. [Citations.] Almost all of the comments challenged here occurred over the course of an afternoon session in which no objection by defense counsel was raised. Not until midmorning the next day—after jurors contemplated the disputed remarks overnight, and after the prosecutor repeated earlier comments about defendant's [theory]—was an objection on grounds of misconduct made. Under the circumstances, the trial court had no opportunity to consider the objection and give appropriate admonitions when the alleged misconduct first occurred, or to prevent additional remarks of a similar nature from being made. Hence, the issue has been waived on appeal." (*People v. Bemore, supra*, 22 Cal.4th at pp. 845-846.)

24

Zareh next argues that because the trial court here ruled there was no need for a curative instruction when the issue was brought to its attention the next morning, we should excuse the failure to object as futile. We cannot conclude a contemporaneous objection would have been futile. Zareh's counsel identified six instances in which they believed USC improperly referred to its financial condition and at least three slides they believed improperly impugned their credibility and motives. Had counsel made a contemporaneous objection, it is possible the court would have curbed or limited any improper argument (particularly given its comment that one of the objected-to slides was "cute at best"). Indeed, this is what *Cassim*, *Bemore*, and *Horn* all contemplate.

Even if we assume for the sake of argument that no waiver occurred and that USC's counsel committed misconduct, Zareh fails to demonstrate a reasonable probability that a more favorable result would have been achieved in the absence of the misconduct. (*Pilliod v. Monsanto Co.*, *supra*, 67 Cal.App.5th at pp. 635-636.) USC's suggestion that it was sued because punitive damages were available only against it and not County is distinguishable from the cases Zareh cites, *Hoffman v. Brandt*, *supra*, 65 Cal.2d 549 and *Whittenburg v. Werner Enterprises Inc.* (10th Cir. 2009) 561 F.3d 1122. In *Hoffman*, the court found prejudice when defense counsel appealed to jurors' sympathies by telling them a verdict against the defendant would cause him to move to a poorhouse. (*Hoffman v. Brandt*, *supra*, at p. 555.) In *Whittenburg*, the plaintiff suffered injuries from a tractor-trailer collision. During closing, the plaintiff's counsel referred to an imagined letter from the defendant trucking company to the plaintiff's children which described "a great many facts about

25

[the] children and [the defendant]'s conduct that lacked any basis in the evidence adduced at trial." (*Whittenburg v. Werner Enterprises Inc.*, *supra*, at p. 1128.) The letter included that the defendant spent vast sums of money to avoid liability and the plaintiff's counsel made similar remarks more than once during closing. (*Id.* at pp. 1129, 1130, fn.1.) Nothing similar occurred here.

Moreover, we find it unlikely that Los Angeles jurors would be either unduly inflamed or sympathetic upon hearing USC's counsel suggest USC has greater available financial resources than County or Cortes, particularly after Zareh's counsel highlighted the wealth of USC's Keck School of Medicine as part of her punitive damages argument. Additionally, the trial court instructed the jury that, "In their opening statements and closing arguments, the attorneys talk to you about the law and the evidence. What the lawyers say may help you understand the law and the evidence, but their statements and arguments are not evidence." Absent a contrary indication in the record, we presume the jury followed that instruction, which ameliorates any alleged misconduct. (See *Cassim v. Allstate Ins. Co.*, *supra*, 33 Cal.4th at pp. 803-804.)

As for the argument concerning the conduct of Zareh's counsel, we see no basis to suggest USC appealed to any antisemitic trope. As for credibility, Zareh fails to address that because of her alteration of the text messages as well as other messages she sent to family touting that she had a "HUGE CASE," the jury had a significant basis anchored in evidence upon which it could doubt Zareh's credibility and motivations. Thus, Zareh fails to show that USC's statements concerning Vinick and Levy unfairly prejudiced the jury against her.

26

## DISPOSITION

The judgment as to USC and County is affirmed.  County and USC are awarded their costs on appeal.

NOT TO BE PUBLISHED

WEINGART, J.

We concur:

ROTHSCHILD, P. J.

CHANEY, J.